UNITED STATES of America,
Appellee,

v.

Sewn NEWTON, Defendant–Appellant.

No. 02–1310(L).

United States Court of Appeals,
Second Circuit.

Argued: Jan. 13, 2004.

Decided: May 26, 2004.

See also 181 F.Supp.2d 157.

Calvin K. Woo, (Joseph W. Martini, of counsel), Pepe & Hazard LLP, Southport, CT, for Defendant–Appellant.

Deborah Sue Mayer, Assistant United States Attorney, Eastern District of New York, Brooklyn, NY (Roslynn R. Mauskopf, United States Attorney; Peter A. Norling, Assistant United States Attorney, on the brief), for Appellee.

Before: CABRANES and RAGGI, Circuit Judges, and MUKASEY, District Judge.[1]

RAGGI, Circuit Judge.

Defendant–Appellant Sewn Newton, who was found guilty after a jury trial in the United States District Court for the Eastern District of New York (David G. Trager, *Judge*) of being a felon in possession of a firearm, *see* 18 U.S.C. § 922(g)(1), is presently incarcerated, serving a 180–month sentence. In now appealing his December 12, 2002 final judgment of conviction, Newton raises three arguments. First, he submits that the district court erred in refusing to suppress the charged gun and related ammunition that were seized during a warrantless search of his residence. Newton does not challenge the district court's conclusion that New York State parole officers had the legal authority to conduct the warrantless search; instead, he asserts that this authority did not extend to New York City police officers who assisted in the search. Second, Newton faults the district court for failing to suppress statements made by him to a parole officer in connection with the challenged search because those statements were made without his being advised of rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Newton submits that the district court erred in holding that (a) the challenged statements were not in response to custodial interrogation and, therefore, did not require *Miranda* warnings; and (b) even if he had been subjected to custodial interrogation, the officers' inquiries fell within the "public safety" exception to *Miranda* recognized in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). Finally, Newton asserts that he was denied a fair trial by prosecutorial misconduct.

We reject Newton's argument that police assistance during an otherwise reasonable warrantless search by parole officers thereby invalidates the search. Further, we conclude that although Newton was subjected to custodial interrogation in connection with the challenged search, the public safety exception to *Miranda* permitted such questioning without advice of rights, at least with respect to inquiries pertinent to discovery of the firearm. As to a subsequent question not falling within this exception, we conclude that any error

---

1. The Honorable Michael B. Mukasey, Chief Judge of the United States District Court for the Southern District of New York, sitting by designation.

in the admission at trial of Newton's response was harmless beyond a reasonable doubt. Finally, we conclude that any improper statements by the prosecutor during summation do not rise to a level warranting reversal. Accordingly, we affirm the judgment of conviction.

## I. *Factual Background*

### A. *The Challenged Search and Statements*

■ The circumstances pertinent to the challenged search and statements were the subject of a pre-trial suppression hearing, after which the district court issued a thorough opinion carefully detailing the facts and analyzing the relevant law. *See United States v. Newton,* 181 F.Supp.2d 157 (E.D.N.Y.2002). Although Newton challenges the district court's conclusions of law, he does not argue that any of its findings of fact were clearly erroneous. Accordingly, we accept those findings and view the facts in the light most favorable to the government. *See United States v. Casado,* 303 F.3d 440, 443 (2d Cir.2002).

In January 2001, at the time of the challenged search, Sewn Newton had three New York State felony convictions: two in 1992 for attempted robbery and one in 1995 for drug trafficking. Newton was sentenced on the last charge to a prison term of five and one-half to eleven years. Prior to his being paroled on March 6, 2000, Newton signed a standard certificate of release by which he agreed to "permit [his] Parole Officer to visit [him] at [his] residence and/or place of employment and [to] permit the search and inspection of [his] person, residence and property."

Some nine months later, on January 8, 2001, senior New York State Parole Officer Carole Flot received a telephone call from a social worker at a victims' services organization reporting a recent conversation with Shirley Wright, Newton's mother, with whom Newton then resided. According to Ms. Wright, Newton had threatened to kill her and her husband. Moreover, Ms. Wright stated that her son kept a gun in a shoe box by the door of her home.

Officer Flot promptly conveyed this information to John Zwaryczuk, another parole officer on duty that day, who, in turn, contacted Newton's supervising officer, Barry Davis. Officer Davis consulted with his supervisor, who advised him to conduct a "safety search" of Ms. Wright's apartment and, if a gun was found, to arrest Newton for violation of parole. Officer Davis, his partner John White, and Officer Zwaryczuk made plans to conduct the search the following day and, to that end, contacted the local police precinct to request back-up assistance.

At approximately 8:00 a.m. on January 9, 2001, Parole Officers Davis, White, and Zwaryczuk, accompanied by three New York City police officers, arrived at Ms. Wright's apartment. After Davis knocked for several minutes, Newton opened the door dressed only in his underwear. Davis asked Newton to step into the hallway, where the officer proceeded to handcuff him without advising him of his *Miranda* rights. Instead, Davis explained to Newton that he was not under arrest but was being restrained for his own safety as well as that of the officers.

Davis then brought Newton back into the apartment, seated him in a chair close to the front door, and asked where his mother was. When Newton responded that she was in the rear of the apartment, Davis and other officers proceeded in that direction and there located Ms. Wright, her husband, and Newton's girlfriend. Meanwhile, Officer Zwaryczuk asked Newton whether he had any "contraband" in the house. Motioning in the direction of a

nearby table, Newton stated, "only what is in the box." When Zwaryczuk asked what was in the indicated shoe box, Newton replied, "a two and two." Upon opening the box, Zwaryczuk discovered an unloaded .22 caliber automatic firearm, a fully loaded magazine, and some loose rounds of ammunition. Zwaryczuk asked Newton what he was doing with a gun while on parole. Newton stated that the gun was for protection but, in fact, did not work. With the firearm thus located within a minute of the officers' entry into the apartment, Newton was placed under parole arrest, and he was handed over to the police officers to process a new state criminal arrest.

### B. *Trials and Sentence*

On February 6, 2001, one month after Newton's arrest and after the state criminal charges were dismissed, a federal grand jury sitting in the Eastern District of New York charged him in a single-count indictment with being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1). Newton stood trial twice on this indictment. The first trial, which began on March 4, 2002, ended in a mistrial on March 7, 2002, after the jury reported that it was hopelessly deadlocked.

At the retrial, which began on May 20, 2002, various law enforcement witnesses testified to the events of January 9, 2001, and to Newton's criminal record. Newton's mother also testified for the prosecution. She stated that on two occasions prior to January 9, 2001, she had found a gun in her apartment, once under a bed in the living room and a second time in a shoe box in the entryway. When she first asked Newton about the gun, he stated that he had it for protection. When she confronted him the second time, he told her that the gun did not work.

Testifying in his own defense, Newton denied making any of the statements pertaining to a firearm ascribed to him either by the law enforcement witnesses or by his mother. Indeed, he denied ever possessing a gun while on parole and specifically denied any knowledge of the seized firearm. Nevertheless, on May 24, 2002, the jury returned a verdict of guilty.

At sentencing, Newton faced a 210–262 month sentencing range based on an offense level of 33, dictated by U.S.S.G. § 4B1.4 (pertaining to "armed career criminals"), and a criminal history category of V. Downwardly departing from this range based on a variety of factors, the district court sentenced Newton to 180 months' incarceration, the minimum term permitted by statute, *see* 18 U.S.C. § 924(e)(1), five years' supervised release, and a $100 special assessment. This timely appeal followed.

## II. *Discussion*

### A. *Challenge to the Warrantless Search of Ms. Wright's Apartment*

■ Newton submits that the district court erred in refusing to suppress the firearm and ammunition seized from his mother's apartment on January 9, 2001. He contends that the participation of police as well as probation officers in the warrantless search of that apartment rendered the search and seizure constitutionally unreasonable. We review *de novo* the legal issues presented by a motion to suppress. *See United States v. Casado,* 303 F.3d at 443.

#### 1. *Warrantless Parole Searches*

■ The Fourth Amendment protects the right of private citizens to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy. *See* U.S. Const. amend. IV; *Kyllo v. United States,* 533 U.S. 27,

33–34, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). Although warrantless searches are generally presumed unreasonable, the law recognizes certain exceptions to this rule. Notably, in *Griffin v. Wisconsin*, the Supreme Court ruled that "[a] State's operation of a probation system ... presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." 483 U.S. 868, 873–74, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). Relying on the "special needs" exception articulated in *Griffin*, this court has ruled that the operation of a *parole* system also presents special needs justifying a departure from the traditional Fourth Amendment warrant requirement. As we said in *United States v. Grimes*, quoting the First Circuit, " '[p]arole is meted out in addition to, not in lieu of, incarceration ...; ergo, parolees enjoy even less of the average citizen's absolute liberty than do probationers.' " 225 F.3d 254, 258 (2d Cir.2000) (per curiam) (quoting *United States v. Cardona*, 903 F.2d 60, 63 (1st Cir.1990)); *see also United States v. Reyes*, 283 F.3d 446, 461 (2d Cir.2002) (holding special needs exception to apply to federal supervised release).[2]

■ Although probationers and parolees are subject to "a degree of impingement upon privacy that would not be constitutional if applied to the public at large," *Griffin v. Wisconsin*, 483 U.S. at 875, 107 S.Ct. 3164, the law requires that such greater intrusions occur pursuant to a rule or regulation "that itself satisfies

the Fourth Amendment's reasonableness requirement," *id.* at 873, 107 S.Ct. 3164. In this case, the district court carefully reviewed New York State parole policies and regulations as well as pertinent state decisional law and concluded that the warrantless search of Newton's residence was conducted pursuant to constitutionally satisfactory rules. *See United States v. Newton*, 181 F.Supp.2d at 162–67. We agree.

New York State Division of Parole regulations state that "[a] releasee will permit his parole officer to visit him at his residence and/or place of employment and will permit the search and inspection of his person, residence and property." N.Y. Comp.Codes R. & Regs. tit. 9, § 8003.2(d). A few days prior to his March 2000 release from state prison, Newton signed a certificate expressly consenting to such parole searches. In *United States v. Reyes*, this court observed that persons on supervised release who sign such documents manifest an awareness that supervision can include intrusions into their residence and, thus, have "a severely diminished expectation of privacy." 283 F.3d at 461.

In *People v. Huntley*, however, the New York Court of Appeals cautioned that standard release certificates should "not ... be taken as an unrestricted consent to any and all searches." 43 N.Y.2d 175, 182, 401 N.Y.S.2d 31, 35, 371 N.E.2d 794 (1977). Whether a particular warrantless parole search "was unreasonable and thus prohibited by constitutional proscription must turn on whether the conduct of the parole

---

**2.** Probation, parole, and supervised release systems are charged with similar duties: " '(1) to assist the offender in the rehabilitation process; (2) to protect the public from persons whose release proves threatening to the community; and (3) to provide information and recommendations to the court or parole board so that it may make appropriate decisions regarding continued freedom for the individual released.' " *United States v.*

*Reyes*, 283 F.3d at 455 (quoting 1 Neil P. Cohen, *The Law of Probation and Parole* § 17:1, at 17–2 (2d ed.1999)). Accordingly, it is appropriate to draw from the law on probation and supervised release in considering whether the warrantless parole search of Newton's residence was reasonable under the special needs exception to the warrant requirement.

officer was rationally and reasonably related to the performance of the parole officer's duty." *Id.* at 181, 401 N.Y.S.2d at 34, 371 N.E.2d 794. In *United States v. Grimes,* we held that *Huntley*'s articulation of a reasonable relationship rule for warrantless parole searches is "coextensive with the requirements of the Fourth Amendment." 225 F.3d at 259 n. 4.

Applying *Huntley* to Newton's case, the district court ruled that the reasonable relationship requirement was satisfied. As it sensibly observed, "the obligation to detect and prevent parole violations so as to protect the public from the commission of further crimes" is part of a parole officer's duty. *United States v. Newton,* 181 F.Supp.2d at 164. Indeed, two months later, in *United States v. Reyes,* this court similarly acknowledged that parole officers have a duty "to investigate whether a parolee is violating the conditions of his parole, . . . one of which, of course, is that the parolee commit no further crimes." 283 F.3d at 459. Thus, once the parole officers in this case received information that Newton had a gun at his residence and had threatened his mother and her husband, it was a reasonable exercise of their parole duty to search Ms. Wright's apartment both "to detect the possession of a firearm in violation of Newton's parole and to protect Wright and her husband." *United States v. Newton,* 181 F.Supp.2d at 165.

As the district court noted, neither *Huntley* nor *Grimes* holds that consent, whether obtained pursuant to parole regulation § 8003.2 or otherwise, is required in addition to a reasonable relationship to the parole officer's duty to justify a warrantless parole search. Nevertheless, the New York State Division of Parole's Policy and Procedures Manual—which provides guidelines for home visits, searches, and seizures by parole officers—does instruct that consent must be obtained to support the warrantless search of a parolee's residence. Specifically, Section II.B.4 of the Manual states that "a releasee's residence may be searched only where the officer has an articulable reason for conducting the search, and then only with the consent of the releasee, or the consent of another adult member of the household." As already noted, in this case this consent requirement was satisfied by Newton's signed certificate of release. *See People ex rel. McNeil v. New York State Bd. of Parole,* 87 Misc.2d 497, 501, 385 N.Y.S.2d 731, 735 (1976) (holding that a parolee's signed certificate of release "expressly consents to a search of his person or residence as a condition of his parole"), *rev'd on other grounds,* 57 A.D.2d 876, 394 N.Y.S.2d 230 (2d Dep't 1977).

Because New York's Parole Manual rule incorporates—indeed, exceeds—the reasonable relationship requirement that we held constitutionally satisfactory in *Grimes,* and because the record amply demonstrates that the Manual's dual requirements of relationship and consent were satisfied in this case, the challenged search of Newton's residence was reasonable under the special needs exception to the Fourth Amendment warrant requirement.

### 2. *Police Assistance in the Parole Search*

■ On appeal, Newton does not seriously challenge that *parole officers* were reasonably entitled under New York rules and regulations to conduct a warrantless search of his residence on January 9, 2001. Instead, he submits that the special needs of parole supervision do not extend to parole searches in which *police officers* participate. Alternatively, Newton asserts that his signed release certification con-

sented to searches only by parole officers, not by the police.

Newton's first argument, a variation of what we have referred to as a "stalking horse" theory, *United States v. Grimes*, 225 F.3d at 259; *see also United States v. Watts*, 67 F.3d 790, 794 (9th Cir.1995) ("A probation officer acts as a stalking horse if he conducts a probation search on prior request of and in concert with law enforcement officers."), *rev'd on other grounds*, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997), is largely foreclosed by our decision in *United States v. Reyes*, 283 F.3d at 462–65, which specifically rejected stalking horse challenges to warrantless searches by probation or parole officers accompanied by the police.[3] Newton attempts to distinguish *Reyes* on the ground that it did not involve a full search but only a less intrusive home visit. In fact, *Reyes*'s rejection of challenges to coordinated efforts between probation/parole officers and other law enforcement officials turned not on the particular level of intrusion in that case, but on the legitimacy of the supervision objectives being pursued by the probation officers. *See id.* at 464. As *Reyes* recognized, the duties and objectives of probation/parole officers and other law enforcement officials, although distinct, may frequently be "intertwined" and responsibly require coordinated efforts. *Id.* at 463–64. For precisely that reason,

*Reyes* noted that "it is difficult to imagine a situation" in which a probation/parole officer who entered a residence with other law enforcement officials based on "information about a supervisee's illegal activities ... would not be· pursuing legitimate supervis[ion] objectives." *Id.* at 463.

Certainly, this is not such a case. The parole officers entered Ms. Wright's apartment in response to her report that Newton possessed a gun at this residence and had recently threatened Ms. Wright and her husband. Because such conduct would clearly violate Newton's parole, the officers had a supervisory duty to investigate. Moreover, because the information suggested criminal conduct in addition to that for which Newton had already been convicted and a not-insubstantial risk that Newton's response to any inquiry might be violent, it was entirely reasonable for the parole officers to solicit the assistance of the police in entering Ms. Wright's residence.

In sum, we reiterate *Reyes*'s rejection of stalking horse challenges and conclude that police presence at Ms. Wright's apartment on January 9, 2001, did not render the warrantless search constitutionally unreasonable.

■ Newton's alternative claim, that the coordinated search exceeded the scope of his signed consent, merits little discus-

---

**3.** In any event, the facts of this case, like those in *Reyes*, do not support a stalking horse challenge. As the Ninth Circuit observed in *Watts*, "collaboration between a probation officer and police does not in itself render a probation search unlawful. The appropriate inquiry is whether the probation officer used the probation search to help police evade the Fourth Amendment's usual warrant and probable cause requirements or whether the probation officer enlisted the police to assist his own legitimate objectives. A probation officer does not act as a stalking horse if he initiates the search in the performance of his

duties as a probation officer." 67 F.3d at 794 (internal citations omitted), *quoted in United States v. Reyes*, 283 F.3d at 463.

In Newton's case, the record amply demonstrates that the initial decision to search his mother's apartment was made by parole officers performing their statutory duty to investigate a report that Newton was committing crimes in violation of his parole. No evidence supports a conclusion that the challenged parole search was a ploy to help police evade the Fourth Amendment warrant requirement.

sion. As already noted, the rule we approved in *United States v. Grimes*, 225 F.3d at 259 n. 4, does not require a parolee's consent to permit parole officers to conduct a warrantless search reasonably related to their supervision responsibilities. More to the point, in *United States v. Reyes*, 283 F.3d at 463–64, we approved coordinated activities between probation/parole officers and other law enforcement officials in furtherance of legitimate supervision objectives even though the specific conditions of supervision there at issue provided for residential intrusions only by a probation officer, with no mention of other law enforcement officials. Finally, even if consent to police presence during parole searches were required, the record in this case indicates so little police involvement in either the decision to conduct the January 9, 2001 search, or the discovery of the firearm and ammunition, that Newton can hardly claim that the police intruded into an area in which he had a reasonable expectation of privacy.

For all these reasons, we hold that the warrantless search of Ms. Wright's apartment on January 9, 2001, was reasonable under the Fourth Amendment, and that the district court properly refused to suppress evidence seized in the course of that search.

B. *Challenge to Statements Made by Newton*

■ Newton asserts that the district court erred in failing to suppress statements made by him on January 9, 2001, in response to inquiries from Officer Zwaryczuk that were not preceded by *Miranda* warnings. To protect the Fifth Amendment right against self-incrimination, the Supreme Court in *Miranda v. Arizona* ruled that police may not interrogate a suspect who has been taken into custody without first warning the person "that he

has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *accord Dickerson v. United States*, 530 U.S. 428, 443–44, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (revisiting and reaffirming *Miranda*). If a suspect is not so warned, the prosecution is barred from using statements obtained during the interrogation to establish its case in chief. *See Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990); *Parsad v. Greiner*, 337 F.3d 175, 184 (2d Cir.2003); *cf. Harris v. New York*, 401 U.S. 222, 224–26, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (holding that statements obtained in violation of *Miranda* may be admitted for impeachment purposes).

■ The government acknowledges that Newton did not receive *Miranda* warnings prior to making the challenged statements to Officer Zwaryczuk, but it argues that the district court correctly ruled that no such warnings were required because (1) Newton was not "in custody" at the relevant time, and (2) even if he was in custody, the questioning fell into the "public safety" exception to *Miranda*. *See United States v. Newton*, 181 F.Supp.2d at 168–78. We review *de novo* the district court's legal conclusion that Newton was not in custody. *See United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir.2004) (and cases cited therein with respect to custody determination); *see also Thompson v. Keohane*, 516 U.S. 99, 112–15, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (holding that once the historical facts pertaining to the interrogation are established, the question whether a person was "in custody" and entitled to *Miranda* warnings pres-

ents a question of law). We apply the same standard of review to the district court's legal conclusion regarding the applicability of the public safety exception. *See United States v. Reyes,* 353 F.3d 148, 151 (2d Cir.2003).

1. *Whether Newton Was "In Custody"*

a. *A Person Is in Custody for Purposes of Miranda When Subjected to Formal Arrest or Restraints Comparable to Those of a Formal Arrest*

█ *Miranda's* warning requirements apply only to "custodial interrogation." *Miranda v. Arizona,* 384 U.S. at 444, 477, 86 S.Ct. 1602; *accord Thompson v. Keohane,* 516 U.S. at 101, 116 S.Ct. 457; *Parsad v. Greiner,* 337 F.3d at 181; *Tankleff v. Senkowski,* 135 F.3d 235, 242 (2d Cir. 1998). In this case, the district court concluded that Newton was not in custody for purposes of *Miranda* when he made the challenged statements because his detention, which was pursuant to a lawful search rather than an arrest, *see Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (holding that persons at the site of a lawful search may be detained without probable cause until the search is concluded), did not involve "the kinds of coercive pressures that would have undermined his will to resist and compelled him to speak." *United States v. Newton,* 181 F.Supp.2d at 175.

The "coercive pressures" standard for custody relied on by the district court derives from *United States v. Morales,* where this court observed that *Miranda's* "in custody" requirement is met if questioning was "conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak." 834 F.2d 35, 38 (2d Cir.1987).

The district court concluded that this "coercive pressures" standard was more in keeping with *Miranda's* underlying compulsion concerns than the "free to leave" test more recently referenced in *Tankleff v. Senkowski:*

"[T]he test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave. An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave."

135 F.3d at 243–44 (quoting *United States v. Kirsh,* 54 F.3d 1062, 1067 (2d Cir.1995)). *Tankleff* did not reject the *Morales* standard. To the contrary, the quoted excerpt is immediately followed by a citation to *Morales* with a parenthetical reference to its statement about "coercive pressures." *Id.* at 244 (citing *United States v. Morales,* 834 F.2d at 38). Nevertheless, the district court noted that *Tankleff's* focus on whether a suspect was "free to leave" was potentially over-inclusive, particularly in light of *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). In that case, the Supreme Court acknowledged that motorists subjected to routine traffic stops would generally not "feel free ... to leave the scene"; nevertheless, it ruled that such motorists were "not 'in custody' for the purposes of *Miranda.*" *Id.* at 436, 440, 104 S.Ct. 3138.

In *Cruz v. Miller,* 255 F.3d 77, 85 (2d Cir.2001), this court similarly recognized the risk of over-inclusion in determining *Miranda* custody by a free-to-leave stan-

dard, as well as the potential tension between that standard and the one articulated in *Morales*. Because *Cruz* involved a habeas petition by a state prisoner, however, we did not need to reconcile any tensions in the *Miranda* jurisprudence. We simply noted "[t]he difficulty of determining 'custody' for purposes of *Miranda* and the Supreme Court's lack of clear guidance on the issue" to support the conclusion that there was no error in the state courts' determination—that *Cruz's* challenged questioning had not been custodial—to warrant relief under the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d)(1). *Id.* at 86 (internal citation omitted).

We take this opportunity to clarify how the free-to-leave test referenced in *Tankleff* and the coercive-pressures test articulated in *Morales* both serve to identify circumstances requiring *Miranda* warnings. The free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody. The "ultimate inquiry" for determining *Miranda* custody, however, is that articulated by the Supreme Court in *California v. Beheler*: "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)); *accord Stansbury v. California*, 511 U.S. 318, 324, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) ("In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (internal quotation marks and alteration omitted)); *New York v. Quarles*, 467 U.S. at 655, 104 S.Ct.

2626 (holding that a person surrounded by four police officers and handcuffed "was in police custody because we have noted that the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest" (internal quotation marks omitted)). In such cases—i.e., where a person formerly at liberty is subjected to formal arrest or arrest-like restraints—specific coercive pressures need not be proved to establish *Miranda* custody; rather, coercive pressures are presumed from the fact of such custody. *See New York v. Quarles*, 467 U.S. at 654, 104 S.Ct. 2626 ("The *Miranda* Court ... presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights." (footnote omitted)).

*United States v. Morales* is not at odds with this conclusion; it simply presents circumstances where it made little sense to ask whether the defendant had been questioned pursuant to formal arrest or arrest-like restraints. Morales was a prison inmate at the time of the challenged questioning; thus, incarceration, not liberty, was his status quo. We have declined, however, to equate such incarceration with custody for purposes of *Miranda*. *See, e.g., United States v. Willoughby*, 860 F.2d 15, 23 (2d Cir.1988); *see also United States v. Menzer*, 29 F.3d 1223, 1232–33 (7th Cir.1994); *Garcia v. Singletary*, 13 F.3d 1487, 1491 (11th Cir.1994); *United States v. Conley*, 779 F.2d 970, 973–74 (4th Cir.1985); *Flittie v. Solem*, 751 F.2d 967, 974 (8th Cir.1985); *United States v. Scalf*, 725 F.2d 1272, 1275 (10th Cir.1984); *Cervantes v. Walker*, 589 F.2d 424, 427–29 (9th Cir.1978). It is in the particular context of prison interrogation that *Morales*'s

focus on the coercive pressures of a custodial setting must be understood. Thus, while the *Morales* formulation of custody relied on by the district court may be useful in cases involving interrogation of individuals already incarcerated on other crimes, for a person not so confined, the appropriate inquiry remains simply whether his freedom of action has been "curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty,* 468 U.S. at 440, 104 S.Ct. 3138 (quoting *California v. Beheler,* 463 U.S. at 1125, 103 S.Ct. 3517). No consideration of additional coercive pressures is required.

In re-emphasizing that *Beheler* articulates the "ultimate inquiry" for determining *Miranda* custody, we do not dismiss the district court's observation that *Miranda*'s animating concern was coercive interrogation techniques. *See United States v. Newton,* 181 F.Supp.2d at 169. Nevertheless, application of its prophylactic rule has largely focused on the custodial status of the person interrogated rather than on the coercive pressures of the particular interrogation means or setting. *Miranda* itself defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 U.S. at 444, 86 S.Ct. 1602. However "slippery" the task of defining such custody has proved in discrete cases, *Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court has resisted efforts to shift attention from the custodial status of the person questioned to the coercive pressures of a particular interrogation, *see generally Orozco v. Texas,* 394 U.S. 324, 326–27, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (holding that *Miranda* warnings must be given to an arrested defendant interrogated in his own home, even though the familiar surround-

ings did not present the compulsive pressures of a police station). The decision to eschew a coercive-pressures test derives from a "practical recognition that '[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.'" *California v. Beheler,* 463 U.S. at 1124, 103 S.Ct. 3517 (quoting *Oregon v. Mathiason,* 429 U.S. at 495, 97 S.Ct. 711). *Miranda* does not reach so broadly. Indeed, the Court has expressly refused to convert "a non-custodial situation ... to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'" *Oregon v. Mathiason,* 429 U.S. at 495, 97 S.Ct. 711. *Mathiason* involved a police station interview, precisely the "coercive environment" highlighted in *Miranda,* 384 U.S. at 461, 477, 86 S.Ct. 1602. Explaining that *Miranda* is triggered only when an individual is "in custody," the Court concluded that because the defendant had voluntarily gone to the station for questioning, he was not entitled to *Miranda* warnings. *Oregon v. Mathiason,* 429 U.S. at 495, 97 S.Ct. 711.

■ Thus, although coercive pressure is *Miranda*'s underlying concern, custody remains the touchstone for application of its warning requirement. The test for custody is an objective one: "whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." *United States v. Ali,* 68 F.3d 1468, 1472 (2d Cir.1995) (internal quotation marks omitted). Focusing on this objective standard has the advantage—certainly from

the perspective of the hundreds of thousands of law enforcement officers who must daily apply *Miranda*—of establishing a regular course of procedure. It does not require officers to administer *Miranda* warnings based on a self-assessment of their actions as "coercive"; rather, it instructs them to administer warnings whenever they place a person under formal arrest or apply restraints generally understood as comparable to those of a formal arrest.

In *Tankleff v. Senkowski*, we acknowledged *Beheler*'s focus on arrest-like restraints, but identified this as the first prong of a *Miranda* custody determination, to be followed by a free-to-leave inquiry, suggesting that the latter was determinative. *See* 135 F.3d at 243–44; *see also Parsad v. Greiner*, 337 F.3d at 181–82 (indicating that *Miranda* custody turned on whether a reasonable person would have felt free to terminate the interrogation and leave, with no mention of arrest or arrest-like restraints); *United States v. Badmus*, 325 F.3d 133, 138 (2d Cir.2003) (same). Reversing the order and weight of the *Tankleff* inquiries would avoid the over-inclusion concerns noted in *Cruz* and by the district court. Doing so would also be consistent with *Thompson v. Keohane*, 516 U.S. at 112, 116 S.Ct. 457, where the Supreme Court highlighted the free-to-leave inquiry as an essential component of "in custody" determination, but then reiterated that "the ultimate inquiry" is the arrest/arrest-like restraint test established by *California v. Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517.

■ As the district court recognized, a free-to-leave inquiry reveals only whether the person questioned was seized. *See generally Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (citing approvingly the test for seizure articulated in *United States v.*

*Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J., joined by Rehnquist, J.) (noting that Fourth Amendment "seizure" occurs "only if, in view of all the circumstances . . . , a reasonable person would have believed that he was not free to leave")); *accord United States v. Peterson*, 100 F.3d 7, 10 (2d Cir.1996). Because seizure is a necessary prerequisite to *Miranda, see, e.g., Oregon v. Mathiason*, 429 U.S. at 495, 97 S.Ct. 711; *California v. Beheler*, 463 U.S. at 1123–24, 103 S.Ct. 3517, however, it makes sense for a court to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights. On the other hand, if a reasonable person would not have thought himself free to leave, additional analysis is required because, as *Berkemer v. McCarty*, 468 U.S. at 439–40, 104 S.Ct. 3138, instructs, not every seizure constitutes custody for purposes of *Miranda. Cf. Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991) ("[I]t is not enough to say a person has been *arrested* simply because, due to police action, he reasonably believes he is not free to leave."). In such cases, a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest. *See California v. Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517; *see also Stansbury v. California*, 511 U.S. at 322, 114 S.Ct. 1526. Only if the answer to this second question is yes was the person " 'in custody' for practical purposes," and "entitled to the full panoply of protections prescribed by *Miranda.*" *Berkemer v. McCarty*, 468 U.S. at 440, 104 S.Ct. 3138.

b. *Handcuffing Newton Restrained Him to a Degree Associated with a Formal Arrest*

■ This court has had few occasions to consider when an investigative stop, particularly one incident to a lawful search as in Newton's case, rises to the level of *Miranda* custody. There is, of course, extensive case law distinguishing between investigative stops and *de facto* arrests in the context of Fourth Amendment probable cause challenges. *See, e.g., United States v. Tehrani,* 49 F.3d 54, 61 (2d Cir. 1995); *Oliveira v. Mayer,* 23 F.3d 642, 646 (2d Cir.1994); *United States v. Perea,* 986 F.2d 633, 644–45 (2d Cir.1993). Some courts have concluded that where an investigatory stop is reasonable under the Fourth Amendment, the seized suspect is not "in custody" for purposes of *Miranda. See United States v. Pelayo–Ruelas,* 345 F.3d 589, 592 (8th Cir.2003); *United States v. Trueber,* 238 F.3d 79, 92 (1st Cir.2001); *United States v. Leshuk,* 65 F.3d 1105, 1110 (4th Cir.1995). This court, however, has specifically rejected Fourth Amendment reasonableness as the standard for resolving *Miranda* custody challenges. In *United States v. Ali,* we stated that "whether [a] 'stop' was permissible under *Terry v. Ohio* . . . is irrelevant to the *Miranda* analysis. *Terry* is an 'exception' to the Fourth Amendment probable cause requirement, not to the Fifth Amendment protections against self-incrimination." 68 F.3d at 1473. A number of our sister circuits are in agreement. *See United States v. Kim,* 292 F.3d 969, 976 (9th Cir.2002) ("whether an individual detained during the execution of a search warrant has been unreasonably seized for Fourth Amendment purposes and whether that individual is 'in custody' for *Miranda* purposes are two different issues"); *United States v. Smith,* 3 F.3d 1088, 1097 (7th Cir.1993) (noting the " 'vast difference' " between *Miranda* rights aimed at " 'protect[ing] a fair criminal trial and the rights guaranteed under the Fourth Amendment' " (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 241, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973))); *United States v. Perdue,* 8 F.3d 1455, 1464–65 (10th Cir. 1993) (holding gunpoint stop that was reasonable under Fourth Amendment nevertheless placed suspect in custody for purposes of *Miranda* ).[4] Thus, instead of asking whether the degree of restraint was reasonable, we have focused on "whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." *United States v. Ali,* 68 F.3d at 1472 (internal quotation marks omitted).

■ The distinction is significant because if the sole issue before us were the Fourth Amendment reasonableness of Newton's initial seizure, we would not hesitate to rule in favor of the government. A Fourth Amendment reasonableness inquiry asks "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable cau-

---

4. In so holding, *Perdue* suggests that the inclination of some courts to hold that *"Miranda* warnings are . . . not implicated in the context of a valid *Terry* stop" was likely based on the expectation that most investigatory stops would involve "a very brief detention without the aid of weapons or handcuffs," an assumption called into question by the "trend granting officers greater latitude in using force . . . to 'neutralize' potentially dangerous suspects during an investigatory detention." 8 F.3d at 1464.

Indeed, the First Circuit has qualified its seeming equation of *Miranda* custody and Fourth Amendment reasonableness. *See United States v. Trueber,* 238 F.3d at 92 ("[a]s a general rule, *Terry* stops do not implicate the requirements of *Miranda* " (internal quotation marks omitted)).

tion in the belief" that the action taken was appropriate?" *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). Among the facts generally deemed relevant are (1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons. *See, e.g., United States v. Tehrani,* 49 F.3d at 61; *Oliveira v. Mayer,* 23 F.3d at 646; *United States v. Perea,* 986 F.2d at 645. No one of these factors is determinative. *See Oliveira v. Mayer,* 23 F.3d at 646. But to satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ "the least intrusive means reasonably available" to effect their legitimate investigative purposes. *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); *see United States v. Perea,* 986 F.2d at 644. At the same time, however, the law recognizes the "important need to allow authorities to graduate their responses to the demands of any particular situation." *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (internal quotation marks omitted). Thus, where an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take "necessary measures ... to neutralize the threat" without converting a reasonable stop into a *de facto* arrest. *Terry v. Ohio,* 392 U.S. at 24, 88 S.Ct. 1868; *accord United States v. Alexander,* 907 F.2d 269, 272 (2d Cir.1990) (holding that a law enforcement officer conducting a *Terry* stop, when "faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists"). This doctrine has supported a range of restraints incident to a stop, from the patdown at issue in *Terry,* to the drawing of firearms, *see United States v. Alexander,* 907 F.2d at 272; *see also Flowers v. Fiore,* 359 F.3d 24, 30 (1st Cir.2004); *Gallegos v. City of Los Angeles,* 308 F.3d 987, 991 (9th Cir.2002); *United States v. Ramires,* 307 F.3d 713, 716 (8th Cir.2002); *United States v. Heath,* 259 F.3d 522, 530 (6th Cir.2001); *United States v. Campbell,* 178 F.3d 345, 349 (5th Cir.1999); *United States v. Edwards,* 103 F.3d 90, 93 (10th Cir.1996); *Foote v. Dunagan,* 33 F.3d 445, 449 (4th Cir.1994); *United States v. Clark,* 24 F.3d 299, 304 (D.C.Cir.1994); *United States v. Tilmon,* 19 F.3d 1221, 1226–27 (7th Cir. 1994); *United States v. Diaz–Lizaraza,* 981 F.2d 1216, 1221 (11th Cir.1993), to the use of handcuffs, *see United States v. Esieke,* 940 F.2d 29, 36 (2d Cir.1991) (holding that use of handcuffs and leg irons to restrain suspected alimentary can@al smuggler did not convert his border detention into an arrest); *see also Flowers v. Fiore,* 359 F.3d at 30; *United States v. Pratt,* 355 F.3d 1119, 1123 (8th Cir.2004); *Meredith v. Erath,* 342 F.3d 1057, 1062–63 (9th Cir.2003); *United States v. Hamlin,* 319 F.3d 666, 671 (4th Cir.2003); *United States v. Neff,* 300 F.3d 1217, 1220 (10th Cir.2002); *United States v. Jordan,* 232 F.3d 447, 449 (5th Cir.2000); *United States v. Gil,* 204 F.3d 1347, 1351 (11th Cir.2000); *Houston v. Clark County Sheriff Deputy John Does 1–5,* 174 F.3d 809, 815 (6th Cir.1999); *United States v. James,* 40 F.3d 850, 875 (7th Cir.1994), vacated on other grounds, 516 U.S. 1022, 116 S.Ct. 664, 133 L.Ed.2d 515 (1995); *United States v. Jones,* 973 F.2d 928, 931 (D.C.Cir.), *reh'g granted and opinion vacated in part on*

*other grounds,* 980 F.2d 746 (D.C.Cir. 1992).

Applying these principles to this case, we conclude that Newton's seizure did not equate to a *de facto* arrest under the Fourth Amendment. The record indicates that his seizure was certainly brief, lasting only the few minutes it took the officers to locate the sought-for firearm, after which Newton was formally arrested. Further, because the stop occurred at Newton's residence, he was subjected to "neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Michigan v. Summers,* 452 U.S. at 702, 101 S.Ct. 2587. To the extent Newton argues that it was unreasonable for six officers to be involved in his seizure, we disagree. The officers' purpose in going to Ms. Wright's apartment was to investigate a report that Newton illegally possessed a firearm and had recently threatened to kill his mother and her husband. Given the obvious dangers inherent in such a volatile situation, not only was it reasonable for six officers to go to the apartment; it was reasonable for them to handcuff Newton while they searched for the firearm. Indeed, under the circumstances, handcuffing was a less intimidating—and less dangerous—means of ensuring the safety of everyone on the premises than holding Newton at gunpoint during the search.

But *Miranda*'s concern is not with the facts known to the law enforcement officers or the objective reasonableness of their actions in light of those facts. *Miranda*'s focus is on the facts known to the seized suspect and whether a reasonable person would have understood that his situation was comparable to a formal arrest.

In *Berkemer v. McCarty,* the Supreme Court identified two factors as particularly relevant to determining whether a lawful investigatory stop involves restraints generally associated with a formal arrest.

The first is whether a reasonable person in the suspect's shoes would have understood that his detention was not likely to be "temporary and brief." 468 U.S. at 437, 104 S.Ct. 3138. The second is whether a person stopped under the circumstances at issue would feel that he was "completely at the mercy of the police." *Id.* at 438, 104 S.Ct. 3138.

How these factors weigh in this case admits no easy answer. Here, Newton was seized when he opened his apartment door to six law enforcement officers, one of whom promptly proceeded to handcuff him. As the district court recognized, the handcuffs are the problematic factor in this set of circumstances. The number of officers on the scene would not, by itself, have led a reasonable person in Newton's shoes to conclude that he was in custody. As a parolee, Newton was accustomed to parole officers coming to his home to ask questions in connection with his supervision, and Newton recognized some of the officers present during the search as persons who had made home visits in the past. Moreover, absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial. *See United States v. Mitchell,* 966 F.2d 92, 99 (2d Cir.1992) (and cases cited therein). The fact that Newton was in his home also renders less significant, for purposes of determining his custodial status, that he was in his underwear while detained. This was simply how Newton had presented himself when he answered the officers' knock at the apartment door. *Cf. Parsad v. Greiner,* 337 F.3d at 182 (assuming, without deciding, that a person voluntarily at a police station is placed in custody if detectives seize his pants). No home detention case cited by the parties, however, addresses the question of custody in the circumstances here at issue: interrogation

of a handcuffed suspect incident to a lawful investigatory stop.[5]

Handcuffs are generally recognized as a hallmark of a formal arrest. *See New York v. Quarles*, 467 U.S. at 655, 104 S.Ct. 2626 (holding that under *Beheler*, handcuffed defendant was in custody for purposes of *Miranda*); *Dunaway v. New York*, 442 U.S. 200, 215 & n. 17, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (listing handcuffs as a "trapping[ ] of a technical formal arrest"); *see also United States v. Maguire*, 359 F.3d 71, 79 (1st Cir.2004) ("the use of handcuffs [is] one of the most recognizable indicia of traditional arrest" (internal quotation marks omitted)); *Meredith v. Erath*, 342 F.3d at 1062–63 (acknowledging that use of handcuffs "substantially aggravates the intrusiveness of a detention" (internal quotation marks omitted)); *United States v. Perea*, 986 F.2d at 645 (and cases cited therein discussing handcuffed status of defendants in resolving custody inquiry); *United States v. Glenna*, 878 F.2d 967, 972 (7th Cir.1989) ("handcuffs are restraints on freedom of movement *normally* associated with arrest"); *United States v. Averell*, 296 F.Supp. 1004, 1019 (E.D.N.Y.1969) (holding that handcuffing person who voluntarily accompanied arrested friend to the police station placed that person in custody: "[w]hen the agents restricted his liberty of movement to such a degree, Aguinaldo was clearly in the custody of the F.B.I."). Thus, a reasonable person finding himself placed in handcuffs by the police would ordinarily conclude that his detention would not necessarily be temporary or brief and that his movements were now totally under the control of the police—in other words, that he was restrained to a degree normally associated with formal arrest and, therefore, in custody.

We do not overlook the fact that Newton was specifically advised that he was *not* being placed under arrest and that the restraints were being employed simply to ensure his own safety and that of the officers. But telling a suspect that he is not under arrest does not carry the same weight in determining custody when he is in handcuffs as it does when he is unrestrained. *Compare United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir.1993) (holding that handcuffed suspect placed in back seat of a squad car was in custody for purposes of *Miranda* even though agents told him he was not under arrest), *with United States v. Salvo*, 133 F.3d 943, 951 (6th Cir.1998) (observing that statement to suspect that he was not under arrest, was free to leave at any time, and would not be arrested at the end of the interview was "an important factor in finding that the suspect was not in custody"). Nevertheless, such disclosure is a fact that may be considered in assessing the extent to which a reasonable person would understand any restraints on his freedom to be comparable to those associated with a formal arrest. *See generally United States v. Gaston*, 357 F.3d 77, 86 (D.C.Cir.2004) (Rogers, J., concurring in part and concurring in the judgment) (contrasting the handcuffed interrogation in Newton's case with that in Gaston's, where defendant was not advised that he was not under arrest

---

**5.** In *United States v. Cota*, 953 F.2d 753 (2d Cir.1992), this court rejected a *Miranda* challenge by a person who had briefly been handcuffed during an investigatory stop of an automobile. *Cota* provides little guidance for resolving this case. That challenged interrogation did not occur while the suspect was handcuffed; instead, she was questioned later, when she voluntarily went to the police station. During that interview, she was not only free to move about the station; she was free to leave it at will. *Id.* at 756, 758–59. Thus, she was not even seized at the time of the challenged questioning, let alone subject to arrest-like restraints on her freedom.

or that handcuffs were for safety reasons).[6]

Having considered all the circumstances presented here, we conclude that a reasonable person would have understood that his interrogation was being conducted pursuant to arrest-like restraints. Although a reasonable person told, as Newton was, that he was not under arrest would likely have understood that he was not about to be removed from his home to the police station—a significant factor in assessing the degree to which one is at "the mercy" of the authorities, *Berkemer v. McCarty,* 468 U.S at 438, 104 S.Ct. 3138—a reasonable person would also have understood that as long as the handcuffs remained in place, his freedom of movement, even within his home, would be restricted to a degree comparable to that of an individual placed under formal arrest. The record does not indicate whether Newton was told that the specific reason for a safety concern in his case was that the officers were searching for a gun. Thus, we cannot assume that a reasonable person in his situation would have understood that the handcuffing would likely last only until the officers had completed their search. Neither can we assume an understanding that removal or maintenance of the handcuffs depended on the outcome of the search rather than on the suspect's responding to questions posed. Because *Miranda's* safeguards "become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest," *Berkemer v. McCarty,* 468 U.S. at 440, 104 S.Ct. 3138 (internal quotation marks omitted), we must conclude that handcuffing Newton, though reasonable to the officers' investigatory purpose under the Fourth Amendment, nevertheless placed him in custody for purposes of *Miranda.*

This conclusion does not, however, mean that the district court erred in refusing to suppress all statements made by Newton without *Miranda* warnings. For the reasons discussed in the next section, we conclude that although Newton was in custody at the time of the challenged interrogation, questioning preliminary to the officers' recovery of the charged firearm fell within the public safety exception to *Miranda.*

### 2. *Miranda's "Public Safety" Exception*

#### a. *The Inquiry Preliminary to Recovery of the Charged Firearm*

 In *New York v. Quarles,* the Supreme Court identified a "narrow exception to the *Miranda* rule," when arresting officers ask a defendant "questions necessary to secure their own safety or the safety of the public." 467 U.S. at 658–59, 104 S.Ct. 2626. Recently reiterating this principle in *United States v. Reyes,* this court observed that "*Miranda* warnings need not precede 'questions reasonably prompted by a concern for the public safety' or for the safety of the arresting officers" for a suspect's answers to be admitted as evidence of his guilt. 353 F.3d at 152 (quoting *New York v. Quarles,* 467 U.S. at 656, 104 S.Ct. 2626). The public safety exception to *Miranda* does not depend upon the subjective motivation of the questioning officer. *See Quarles,* 467 U.S. at 655–56, 104 S.Ct. 2626. Rather, it applies so long as the questioning "relate[s] to an objectively reasonable need to protect the police or the public from any immediate danger." *Id.* at 659 n. 8, 104

---

6. *Gaston* did not decide whether the handcuffing in that case constituted custody because it found the challenged interrogation to fall within the "booking exception" to *Miranda. See United States v. Gaston,* 357 F.3d at 82.

S.Ct. 2626; *accord United States v. Reyes*, 353 F.3d at 154.

In this case, the officers who went to the apartment to perform the search knew that Ms. Wright had recently reported both her son's possession of a firearm in their home and his threats to kill her and her husband. This information supported an objectively reasonable belief that Newton was dangerous, that he and his family were involved in a volatile domestic dispute, and that, until the gun was found, there was a serious and immediate risk of harm to anyone in the apartment.

Newton submits that his situation did not present the sort of danger contemplated by the public safety exception because (1) he was handcuffed when the challenged questions were asked; (2) the officers knew the location of the gun when they entered the apartment, based upon information earlier provided by Ms. Wright; and (3) some of the parole officers on the scene were familiar with the apartment's layout. These arguments are unconvincing.

In *Quarles*, the defendant was also handcuffed when police asked him to disclose where in a supermarket he had disposed of a firearm. Nevertheless, the Supreme Court concluded that the gun still presented a public danger because "an accomplice might make use of it," or "a customer or employee might later come upon it." *New York v. Quarles*, 467 U.S. at 657, 104 S.Ct. 2626. So in this case, the presence of three persons in the apartment in addition to Newton,[7] the reported hostility among these individuals, and the possi-

bility that such hostility could turn against law enforcement officers combined to support an objective belief that even with Newton handcuffed, the unlocated gun presented a deadly risk to everyone on the premises. That some of the officers were familiar with the apartment's layout was small safeguard against this risk. Finally, although Newton's mother had reported the location of the gun in her phone call the previous day, it was entirely possible that Newton had moved the firearm between the time of his mother's call and the officers' arrival at the apartment.

Newton further argues that Officer Zwaryczuk's first question fell outside the public safety exception because it inquired about "contraband" and was not limited to the firearm that presented the only known safety concern. The argument is not well taken. Courts recognize that public safety questions are framed spontaneously in dangerous situations. Precision crafting cannot be expected in such circumstances. Thus, in *Reyes* we concluded that an officer arresting a narcotics trafficker acted within the public safety exception when he asked the defendant whether he had "anything on him that [could] hurt [the officer] or anyone on [the] field team," even though the broad question prompted the defendant to disclose his possession of a packet of drugs as well as a firearm. *United States v. Reyes*, 353 F.3d at 150, 154 (holding that police could not be faulted when defendant gave an unforeseeable non-responsive answer to a public safety query). In *United States v. Williams*, 181

---

7. It is not clear from the record whether all three persons had been located at the time Officer Zwaryczuk questioned Newton, or whether fellow officers were still conducting a security sweep of the premises. In either case, the possible presence of other persons in the apartment who might reach the gun before officers could seize it supported a public

safety inquiry. *See United States v. Reyes*, 353 F.3d at 153 (distinguishing *United States v. Mobley*, 40 F.3d 688, 690–94 (4th Cir.1994) (rejecting public safety exception on the ground that the defendant was alone in the apartment and the premises had been secured at the time of the challenged questioning)).

F.3d 945 (8th Cir.1999), which we cited approvingly in *Reyes,* 353 F.3d at 152, the Eighth Circuit approved on public safety grounds an even broader police inquiry of an arrested crack dealer—"is there anything we need to be aware of?"—which prompted defendant to offer a response clearly related to public safety, namely, that he had a gun in a closet, *Williams,* 181 F.3d at 953. *Williams* explained that although the question "did not specifically refer to weapons or safety concerns," it plainly encompassed such matters. *Id.* at 953 n. 13. "The fact that the question was also broad enough to elicit other information [did] not prevent application of the public safety exception when safety was at issue." *Id.*[8]

The same logic applies to this case. Although Officer Zwaryczuk's inquiry about "contraband" did not specifically refer to firearms, the term plainly encompassed such items. Indeed, Newton's response indicates that he so understood the question. That the term "contraband" could also include items not presenting immediate public safety concerns does not defeat the *Miranda* exception in this case.

Accordingly, although Newton was in custody when he was interrogated and had not been advised of his *Miranda* rights, his responses leading to the discovery of the charged firearm were properly admitted under the public safety exception to *Miranda.*

b. *The Question Posed after Recovery of the Firearm*

[20] Once Officer Zwaryczuk recovered the charged firearm from the location indicated by Newton, two things were plain: (1) Newton would be formally arrested,

and (2) the weapon no longer presented an immediate risk of danger to persons in the apartment. Nevertheless, without advising Newton of his *Miranda* rights, Zwaryczuk proceeded to ask why he had the gun. The government concedes, as it must, that this further inquiry does not fall within *Miranda*'s public safety exception. It urges us to find admission of Newton's response harmless error. *See* Fed. R.Crim.P. 52(a).

■ Since *Miranda*'s warnings requirement is constitutionally based, *see Dickerson v. United States,* 530 U.S. at 439–40, 120 S.Ct. 2326, the admission of statements obtained in violation of its rule may be deemed harmless only if it appears "beyond a reasonable doubt that the error ... did not contribute to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see Tankleff v. Senkowski,* 135 F.3d at 245–46 (applying harmless error analysis to admission of statements obtained in violation of *Miranda*). That is this case.

According to Officer Zwaryczuk, Newton responded to the challenged inquiry by stating that the gun was "for protection" but that it did not work. The statement inculpates Newton to the extent that it seemingly acknowledges his possession of the gun. Nevertheless, it appears beyond a reasonable doubt that the statement did not contribute to the jury verdict because Newton had essentially acknowledged possession in his earlier response to Zwaryczuk's public safety inquiry. *See Parsad v. Greiner,* 337 F.3d at 185 (finding harmless error when erroneously admitted statements were cumulative of properly admitted statements). Officers Davis and Zwar-

---

8. To be sure, the public safety exception does not permit officers to pose "questions designed *solely* to elicit testimonial evidence from a suspect." *New York v. Quarles,* 467 U.S. at 658–59, 104 S.Ct. 2626 (emphasis added). Thus, to fall within the exception, a question must have some rational relationship to defusing the perceived danger.

yczuk both testified that when Newton was asked if *he* had any contraband, Newton responded by motioning toward the table on which the box containing the gun was sitting. Newton then provided further circumstantial evidence that the charged firearm was his by identifying its caliber, a "two and two." Newton's admissible statements acknowledging possession of the firearm were further corroborated by his mother's testimony that she had twice found in her apartment a firearm like the one seized from the shoebox and that when she confronted Newton with the weapon, he acknowledged that the gun was his.

The fact that Newton's first trial ended in a hung jury does not alter our harmless error conclusion. A jury may hang for any number of reasons, including the idiosyncratic views of a single juror. Thus, while a prior hung jury may support a finding that an error committed with respect to a very close issue during a retrial is not harmless, *see, e.g., United States v. Beckman,* 222 F.3d 512, 525 (8th Cir.2000); *United States v. Paguio,* 114 F.3d 928, 935 (9th Cir.1997), it does not compel such a conclusion. Newton's possession of the gun was not a close issue. We therefore conclude that the erroneous admission of Newton's statement in response to an inquiry posed after discovery of the charged firearm was harmless beyond a reasonable doubt and does not require reversal.

### C. *Challenge to the Government's Summation*

▆▆▆▆▆ Newton submits that prejudicial comments made by the prosecutor in summation deprived him of his due process right to a fair trial.[9] His burden on this claim is a heavy one. As the Supreme Court has cautioned, "a criminal conviction is not to be lightly overturned on the basis

of a prosecutor's comments standing alone." *United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *see United States v. Rodriguez,* 968 F.2d 130, 142 (2d Cir.1992) ("It is a 'rare case' in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required."). An aggrieved party must show more than mere trial error to secure reversal; he must demonstrate misconduct so egregious that, when viewed in the context of the entire trial, it substantially prejudiced him. *See United States v. Shareef,* 190 F.3d 71, 78 (2d Cir. 1999); *United States v. Perez,* 144 F.3d 204, 210 (2d Cir.1998). In assessing whether a defendant has sustained substantial prejudice, we consider the severity of the alleged misconduct, any curative measures taken by the trial court, and the likelihood of conviction absent the challenged conduct. *See United States v. Elias,* 285 F.3d 183, 190 (2d Cir.2002).

Newton's principal complaint concerns a statement made by the prosecutor in rebuttal that attempted to use defense counsel's rhetoric challenging Ms. Wright's credibility to suggest that Newton's testimony was even more unreliable. Defense counsel had argued:

> The court will tell you that proof beyond a reasonable doubt is the kind of proof that causes a reasonable person to hesitate to act in an important matter of his or her own life. That's not, honey, shall we stop and get milk on the way home from the movies. That is am I letting Shirley Wright take my child's hand and cross the street, and am I relying on her judgment, and am I relying on her senses, 30 years of crack, a crack-head.

Trial Tr. at 433–34 (May 23, 2002). In rebuttal, the prosecutor stated:

---

**9.** We note that neither of the Assistant United States Attorneys representing the government

on this appeal are the prosecutor whose remarks are at issue.

[Defense counsel] invited you to consider the credibility of Ms. Shirley Wright by asking yourselves if you would like her to walk your child across the street. Similarly, I ask you in determining the credibility of the defendant, close your eyes, ask yourselves would you let him anywhere near your children?

*Id.* at 457.

The defense moved for a mistrial, arguing that the last statement implied that Newton was a "predator." The district court rejected the argument as hyperbolic, although it did note that the prosecutor's comment was irrelevant to Newton's credibility.[10] Nevertheless, the court concluded that the error was not so severe as to warrant a mistrial. We agree. *See generally United States v. Simmons,* 923 F.2d 934, 955 (2d Cir.1991) (holding that prosecutor's summation reference to the "collapsed veins of junkies" was not enough, by itself, to warrant reversal). Further, because the error was not serious, the district court acted reasonably in deciding not to highlight it with a special curative admonition, relying instead on its general instruction that the jury must base a verdict only on the evidence and that the attorneys' arguments were not evidence. In making this decision, the district court specifically observed that the challenged statement was unlikely to affect jury deliberations because it was lost "in the fog" of a rebuttal summation so repetitive and boring that a number of jurors had to struggle to remain awake. This blunt observation by an experienced trial judge is worthy of our note because " '[i]n reviewing criminal cases it is particularly impor-

tant for appellate courts to relive the whole trial imaginatively' " and not to give disproportionate emphasis to isolated incidents of alleged error. *United States v. Young,* 470 U.S. at 16, 105 S.Ct. 1038 (quoting *Johnson v. United States,* 318 U.S. 189, 202, 63 S.Ct. 549, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring)).

■ Newton contends that the challenged rebuttal statement was not, in fact, an isolated instance of prosecutorial misconduct. He submits that the prosecution summation was rife with instances of impermissible vouching for its witnesses. It is, of course, well established that the prosecution may not vouch for its witnesses' credibility. *See, e.g., United States v. Perez,* 144 F.3d at 210. Vouching may prejudice a defendant by suggesting to a jury that there is additional evidence, not introduced at trial but known to the prosecutor, that supports the witness's credibility. *See United States v. Young,* 470 U.S. at 18, 105 S.Ct. 1038; *accord United States v. Perez,* 144 F.3d at 210. Further, prosecutorial vouching "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young,* 470 U.S. at 18–19, 105 S.Ct. 1038; *accord United States v. Melendez,* 57 F.3d 238, 240–41 (2d Cir.1995).

Most of the statements challenged by Newton—specifically, those in which the prosecutor "submitted" certain credibility conclusions for jury consideration[11]—do not qualify as vouching. *See United States v. Perez,* 144 F.3d at 210 (approving use of

---

**10.** The district court also observed that defense counsel's argument had not been particularly relevant to an assessment of Ms. Wright's credibility.

**11.** For example, the prosecutor stated: "We submit to you ... that [Ms. Wright] testified

truthfully"; "we submit to you ... that this testimony from Shirley Wright was credible"; and "we submit to you ... that when you begin to evaluate these factors, you will realize the defendant did not tell you the truth here today." Trial Tr. at 410–13.

"I submit" to urge the jury to reach certain conclusions without impermissibly interjecting the prosecutor's personal beliefs into the case). Other statements not framed as submissions—notably, the prosecution's assertion that "[t]hese are credible witnesses," Trial Tr. at 417, and its statement that "[t]hey came in here and told ... the truth," *id.* at 454—do raise a vouching concern. No trial objection, however, was raised to these statements. Not only does this omission limit our review to plain error, which Newton clearly has not demonstrated, *see United States v. Rybicki,* 354 F.3d 124, 129 (2d Cir.2003) (en banc) (stating plain error standard), it also strongly indicates that defense counsel at trial did not understand the statements to communicate impermissible vouching, *see United States v. Canniff,* 521 F.2d 565, 572 (2d Cir.1975).[12]

Thus, we conclude that any prosecution errors in summation were not so egregious as to warrant reversal.

### III. *Conclusion*

To summarize, we conclude that (1) police assistance during a reasonable warrantless search by parole officers does not invalidate the search and, therefore, that the district court properly refused to suppress the items found during the search of Newton's mother's apartment; (2) although Newton was subjected to custodial interrogation without being advised of his *Miranda* rights, questions related to the

discovery of the firearm fell within the public safety exception and, therefore, Newton's responses were properly admitted at trial; (3) the admission of Newton's responses to questions not falling within the public safety exception was harmless beyond a reasonable doubt; and (4) any improper statements by the prosecutor during summation were not so prejudicial as to warrant reversal. Accordingly, the judgment of the district court is hereby AFFIRMED.

---

12. One other summation point deserves mention: the prosecutor's argument that law enforcement witnesses should be believed because they are men "who work hard. They go out there, and they monitor parolees at all hours of the day and night." Trial Tr. at 399. These statements came close to urging the jury to find the officers credible because of their official positions, an argument not permitted by the law. *See generally United States v. Lawes,* 292 F.3d 123, 130–31 (2d Cir.2002). Newton, however, did not object to these statements on this particular ground when they were made, nor does he raise this argument on appeal. At any rate, the error, if there was any, was hardly severe and was effectively cured by the district court's charge, which instructed jurors that they were to determine the credibility of law enforcement witnesses by the same standards applicable to other witnesses and that such officers' testimony was not entitled to greater or lesser weight than that of ordinary witnesses.