**UNITED STATES of America,**

v.

**Robert GROEZINGER, Defendant.**

**No. 08 Cr. 1210 (SCR).**

United States District Court, S.D. New York.

June 8, 2009.

Anna Margaret Skotko, U.S. Attorney's Office, White Plains, NY, for United States of America.

Vincent L. Briccetti, Briccetti, Calhoun and Lawrence, White Plains, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

STEPHEN C. ROBINSON, District Judge.

Robert Groezinger has been indicted with receipt and distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(B), and possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). On September 8, 2008, agents with the United States Department of Homeland Security executed a search warrant issued by a United States Magistrate Judge at Mr. Groezinger's apartment in Patterson, New York. Agents seized a Dell laptop computer and a Cruzer 1.0 gigabyte thumb drive, as well as numerous compact and floppy discs, another thumb drive, and documents. Among these items, agents found in excess of forty images of child pornography and numerous e-mails and chats discussing sexually explicit conduct involving minors. During the search, agents questioned Mr. Groezinger without advising him of his *Miranda*[1] rights, and they also interviewed tenants who resided in the basement apartment. One of these tenants provided the agents with a Maxtor hard drive, which the tenant stated that Mr. Groezinger had given to him in March or April of

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2008. After conducting a forensic examination of the hard drive, agents found one image containing child pornography.

Mr. Groezinger has filed pre-trial motions seeking to suppress physical evidence seized from his residence; to suppress his statements; to suppress physical evidence obtained from his tenant; and to compel the Government to make certain pre-trial disclosures.

For the reasons set forth in this opinion, the Court denies Mr. Genin's pretrial motions in their entirety.

# I

## BACKGROUND

### A. The Warrant Affidavit

The following facts were obtained from an affidavit signed by Leonard Bogdanski, a Special Agent with Immigration and Customs Enforcement ("ICE"), and submitted in connection with the Government's application for a search warrant for Mr. Groezinger's residence.

An investigation conducted by ICE led to the arrest of an individual residing in California (the "CA Perpetrator") on charges of receipt and distribution of child pornography. The CA Perpetrator used an Internet chatroom service called Google Hello[2] to facilitate the CA Perpetrator's dissemination of child pornography[3] to a number of individuals, both in the United States and abroad. Google Hello was a free computer program that allowed users to send images and text via the Internet, similar to an instant messaging program. The program also allowed users to view the same images in real-time and to share images through computer security firewalls.

Based on evidence recovered from the CA Perpetrator's computer and other sources, ICE agents identified several individuals who communicated with the CA Perpetrator via Google Hello and who received and distributed child pornography during those online communications. Among these was an individual using the Google Hello username of "picluverinusa" (alleged to be Mr. Groezinger) who, according to the warrant affidavit, engaged in chats with the CA Perpetrator on December 21, 2007, and January 19, 2008. During these chats, the warrant affidavit states, picluverinusa "received and distributed images containing child pornography." Affirmation of Vincent L. Briccetti ("Briccetti Affirm.") Exh. B ¶ 9.

On December 21, 2007, picluverinusa contacted the CA Perpetrator via instant messaging and wrote that he " 'spotted [the CA Perpetrator] in dirtyhello.' " *Id.* ¶ 10.a. Picluverinusa stated that he liked "anything young and cute no age prefs." *Id.* The CA Perpetrator then sent to picluverinusa "in excess of 10 images, which were subsequently recovered from the [CA] Perpetrator's computer and many of which contain child pornography." *Id.* On January 19, 2008, picluverinusa again con-

---

**2.** According to Google's website, Google Hello was shut down on June 11, 2008.

**3.** As will be discussed in more detail, federal law defines five categories of behavior that constitute sexually explicit conduct for purposes of child pornography. *See* 18 U.S.C. § 2256(8) (defining "child pornography" as "any visual depiction, including any ... picture ... where (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct"). Section 2256(2)(A) defines "sexually explicit conduct" as "actual or simulated (i) sexual intercourse ...; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person." The warrant affidavit does not specify which category of child pornography the photographs/videos peddled by the CA Perpetrator fell into.

tacted the CA Perpetrator using Google Hello, and, during the course of their chat, the warrant affidavit explains, picluverinusa sent "in excess of 15 images, which were subsequently recovered from the [CA] Perpetrator's computer and many of which contain child pornography." *Id.* ¶ 10.b. The warrant affidavit does not describe the images sent between the CA Perpetrator and picluverinusa or state which category of child pornography they fell into, *see supra* note 3.

The warrant affidavit then states that, according to records maintained by Google, the username picluverinusa was associated with the e-mail address picluver@yahoo.com, which was accessed using the IP address 67.189.184.170. That IP address, in turn, was assigned for the period of November 2, 2007, until March 5, 2008, to an Internet account in the name of Mr. Groezinger at the service address of 889 Route 311, Patterson, New York (the "Patterson address").[4] The warrant affidavit explains that Agent Bogdanski spoke with the United States Postal Carrier who serviced the Patterson address, and the Postal Carrier confirmed that Mr. Groezinger received mail at the Patterson address. Agent Bogdanski also confirmed with a representative of the utility company that supplies power to the Patterson address that Mr. Groezinger was listed as the then-current authorized account holder. Finally, law enforcement agents, the warrant affidavit recounts, surveilled the Patterson address, and those agents observed an individual who resembled the photograph and physical description contained in Mr. Groezinger's passport application submitted in 2003.

Agent Bogdanski's affidavit, containing the foregoing information, was presented to a United States Magistrate Judge on September 4, 2008, who signed the warrant authorizing the search of Mr. Groezinger apartment.

In response to Mr. Groezinger's pretrial motions, the Government has submitted an affirmation from Agent Bogdanski noting several errors—inadvertent and immaterial, in the Government's view—contained in the warrant affidavit. The warrant affidavit stated that picluverinusa had "received and distributed" images containing child pornography, when, in fact, picluverinusa had received but not distributed such images. Affirmation of Special Agent Bogdanski ("Bogdanski Affirm.") ¶ 5.a. It also mistakenly alleged that picluverinusa had "sent" in excess of 15 images, many of which contained child pornography, when, in fact, picluverinusa had received such images. *Id.* ¶ 5.b. Finally, the warrant affidavit stated that the Google Hello username was the e-mail address picluver@yahoo.com, but the username, in fact, was "picluverinusa." *Id.* ¶ 5.c.

## B. The Search and Mr. Groezinger's Statements

At approximately 6:00 a.m. on September 8, 2008, Agent Bogdanski and other law enforcement agents arrived at Mr. Groezinger's residence. After the agents informed him that they had a warrant to search his residence, Mr. Groezinger opened the door and allowed the agents to enter.

The agents conducted a protective sweep of the residence, asking Mr. Groezinger to remain in the living room and telling him explicitly that he was *not* under arrest. During the search of the residence, Mr. Groezinger remained in the

---

**4.** The warrant affidavit also noted that the Patterson address had a separate residence that had been previously rented to a tenant.

kitchen with two agents. Mr. Groezinger claims that he "got up once or twice and was told to sit down," and he also had to ask the agents' permission to make coffee. Affidavit of Robert Groezinger ("Groezinger Aff.") ¶ 1.[5] In response to the agents' questions, Mr. Groezinger explained that he had gotten rid of his old computer because "the motherboard fried." Memorandum of Law of the United States of America in Opposition to the Defendant's Pretrial Motions ("Gov't Mem.") at 10. Mr. Groezinger also informed the agents that he was an attorney and that he had to catch the 7:00 a.m. train to make a morning court appearance in the Southern District of New York. The agents told Mr. Groezinger that he was going to be late. At no point did the agents inform Mr. Groezinger of his *Miranda* rights or tell him that he was free to leave. The search of Mr. Groezinger's residence took approximately an hour and a half.

Agents seized, among other items, a laptop computer and a thumb drive from Mr. Groezinger's residence. After conducting a forensic examination of these items, agents found in excess of forty images of child pornography and numerous e-mails and chats discussing sexually explicit conduct involving minors.

During the search of Mr. Groezinger's residence, agents briefly interviewed the basement tenants, whom the agents already knew to be living there. One of the tenants gave the agents a Maxtor hard drive. The tenant explained that Mr. Groezinger had given him the hard drive in March or April of 2008 to use as a backup hard drive, after Mr. Groezinger had problems with the motherboard. A forensic examination of the hard drive revealed documents related to Mr. Groezing-

er's law practice and at least one image containing child pornography.

## II

## DISCUSSION

### A. Motion to Suppress Evidence

On January 26, 2009, this Court issued an opinion in *United States v. Genin,* 594 F.Supp.2d 412, 418–426 (S.D.N.Y.2009), which held that the warrant issued in that case was not supported by probable cause, and the parties dispute whether the search warrant issued in this case was supported by probable cause under the principles set forth in *Genin.* After setting forth the applicable standard of review, the Court shall turn to the parties' arguments regarding *Genin.*

### 1. Standard of Review

■ A magistrate's determination that probable cause exists to support the issuance of a search warrant, the Supreme Court of the United States has explained, "should be paid great deference by reviewing courts." *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983) (explaining that a reviewing court "should start with the proposition that the magistrate's finding of probable cause is entitled to substantial deference"); *United States v. Gotti,* 399 F.Supp.2d 214, 225 (S.D.N.Y.2005) (same). The role of the reviewing court therefore is circumscribed to ensuring that the issuing magistrate had a "substantial basis" for concluding that probable cause existed. *See Gates,* 462 U.S. at 236, 103 S.Ct. 2317; *Walczyk v. Rio,* 496 F.3d 139, 157 (2d Cir.2007). Given this deferential standard,

---

**5.** In his affidavit, Mr. Groezinger also claims that he "expected to be formally arrested." Groezinger Aff. ¶ 7.

the reviewing court "resolve[s] any doubt about the existence of probable cause in favor of upholding the warrant." *United States v. Salameh,* 152 F.3d 88, 113 (2d Cir.1998) (citing *United States v. Jakobetz,* 955 F.2d 786, 803 (2d Cir.1992)); *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) ("The Fourth Amendment demonstrates a strong preference for searches conducted pursuant to a warrant and the police are more likely to use the warrant process if the scrutiny applied to a magistrate's probable-cause determination to issue a warrant is less than that for warrantless searches." (internal quotation marks and citation omitted)).

Nevertheless, it is for the reviewing court to "decide whether the magistrate performed his neutral and detached function on the facts before him, and did not merely serve as a rubber stamp for conclusions drawn by the police." *Travisano,* 724 F.2d at 345. As the Supreme Court emphasized in Gates, a warrant affidavit "must provide the magistrate with a substantial basis for determining the existence of probable cause, and ... wholly conclusory statement[s] ... fail[ ] to meet this requirement." *Gates,* 462 U.S. at 239, 103 S.Ct. 2317. "In order to ensure that ... an abdication of the magistrate's duty does not occur," the Supreme Court has instructed, "courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued." *Id.*

### 2. The Search Warrant Was Not Supported by Probable Cause

Under the Fourth Amendment to the Constitution of the United States, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Probable

cause, the Supreme Court has observed, is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates,* 462 U.S. at 232, 103 S.Ct. 2317 (explaining that probable cause does not require a "prima facie showing"). It exists if, "given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238, 103 S.Ct. 2317; *see also United States v. Falso,* 544 F.3d 110, 117 (2d Cir.2008). Thus, although "probable cause requires more than a 'mere suspicion,' of wrongdoing, its focus is on 'probabilities,' not 'hard certainties.'" *Walczyk,* 496 F.3d at 156 (quoting *Mallory v. United States,* 354 U.S. 449, 455, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) and *Gates,* 462 U.S. at 231, 103 S.Ct. 2317). Whether the probabilities amount to probable cause must be assessed in light of " 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* (quoting *Gates,* 462 U.S. at 231, 103 S.Ct. 2317).

To issue the warrant in question here, the magistrate judge had to find that there was probable cause to believe that Mr. Groezinger's residence contained photographs or videos depicting (1) minors (2) engaged in sexually explicit conduct. *See* 18 U.S.C. § 2256(8) (defining "child pornography" as "any visual depiction, including any ... picture ... where (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct"). Federal law delineates five categories of sexually explicit conduct. Specifically, section 2256(2)(A) defines "sexually explicit conduct" as "actual or simulated (i) sexual intercourse ...; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious ex-

hibition of the genitals or pubic area of any person."

■ The last category of sexually explicit conduct—lascivious exhibition of the genitals or pubic area—often "calls into play imprecise value judgments raising issues comparable to those that arise when testing for obscenity." *United States v. Jasorka,* 153 F.3d 58, 60 (2d Cir.1998); *see also United States v. Battershell,* 457 F.3d 1048, 1051 (9th Cir.2006) (noting that "[t]he first four categories [of sexually explicit conduct], with the possible exception of the fourth category, . . . involve easily identifiable nouns that are not qualified by amorphous adjectives"). In Brunette, for example, the Government submitted a warrant affidavit asserting that an agent had reviewed thirty-three photographs and determined that those photographs fell within the statutory definition of child pornography. *United States v. Brunette,* 256 F.3d 14, 15–16 (1st Cir.2001) (noting that the agent "did not append any of the allegedly pornographic images to the warrant application . . . [n]or . . . a description of them"). The Court of Appeals for the First Circuit determined that the warrant had not been supported by probable cause. It explained that, in this context, "[a] judge cannot ordinarily make [a probable cause] determination without either a look at the allegedly pornographic images, or at least an assessment based on a detailed, factual description of them." *Id.* at 18. "This judicial determination," the First Circuit remarked, "is particularly important in child pornography cases, where the existence of criminal conduct often depends solely on the nature of the pictures." *Id.* Indeed, "the identification of images that are lascivious will almost always involve, to some degree, a subjective and conclusory determination on the part of the viewer," the First Circuit explained, and "[t]hat inherent subjectivity is precisely why the determination should be made by a judge, not an agent." *Id.* at 18 (internal quotation marks omitted); *Genin,* 594 F.Supp.2d at 421 (noting that "a magistrate's action cannot be a mere ratification of the bare conclusion of others nor a proverbial rubber stamp for conclusions drawn by the police" (internal quotation marks and citations omitted)).

■■ It is the inherent subjectivity involved in determining whether materials are lascivious—a determination that must be made after a searching analysis of the case law, *see United States v. Rivera,* 546 F.3d 245, 250–53 (2d Cir.2008)—that the Government's argument elides. It contends that "magistrate judges reviewing search warrants routinely rely on determinations made by agents that contraband evidence is, in fact, contraband and there is no compelling reason why cases involving child pornography should be different." Gov't Mem. at 19. According to the Government, "magistrate judges are not required to personally inspect firearms (that could turn out to be toy guns); drugs (that could turn out to be baby powder); counterfeit currency (that could turn out to look like monopoly money); or classified intelligence (that could turn out to be mere story telling)." *Id.* at 19–20. The foregoing examples do not generally require any analysis of the indeterminate territory separating the legal from the illegal. That is to say, a gun either is or is not a toy, and counterfeit currency either is or is not counterfeit. Whether photographs are lascivious *vel non,* however, "calls into play imprecise *value judgments*" of the viewer, *Jasorka,* 153 F.3d at 60 (emphasis supplied), and the Fourth Amendment demands that those value judgments be made by a *neutral, detached* magistrate rather than a law enforcement official with a vested interest in obtaining a search warrant. *United States v. Leon,* 468 U.S.

897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Justice Potter Stewart famously wrote that "hard core pornography" was difficult to define but "I know it when I see it." *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring). So too is lascivious exhibition of the genitals difficult to assess. Therefore, its determination requires that a magistrate judge either see the allegedly lascivious pictures or have a sufficiently detailed description proffered by the Government.

 "As a consequence of the interpretive ambiguity inherent in the term 'lascivious ...,'" this Court explained in *Genin*, "a magistrate may not issue a search warrant based solely on a law enforcement officer's *conclusion* that the target of the warrant is in possession of 'lascivious' photographs or videos." 594 F.Supp.2d at 421 (emphasis supplied). Instead, courts must, in this context, "require the law enforcement officer either to append the allegedly lascivious material or ... to provide a description that is sufficiently detailed for a magistrate to reach an independent legal conclusion that the material is indeed lascivious." *Id.* (citation omitted). Importantly, *Genin* does not

purport to alter the substantive standard for probable cause in the context of child pornography. It merely requires that law enforcement officials who are relying on images of child pornography to establish probable cause provide a sufficiently detailed description of those images rather than resting on their own conclusion that the images depict sexually explicit conduct. This is not a particularly onerous requirement. In every case in which an agent is able to provide his or her conclusion that the images depict sexually explicit conduct, the agent obviously has seen the images and therefore can either attach the offending materials or simply describe in the warrant affidavit what he or she has seen.

 In this case, the warrant affidavit did not delineate which of the five categories of sexually explicit conduct the photographs that Agent Bogdanski reviewed fell into. Therefore, the magistrate judge had no way of knowing whether the images that Mr. Groezinger had received from the CA Perpetrator depicted one of the first four categories of sexually explicit conduct, which courts have held are "clearly defined and easily recognized," or the last category—lascivious depiction of the genitals or pubic area.[6] *Jasorka*,

---

**6.** The Government believes it important that the warrant affidavit at issue here "did not limit the category of images containing child pornography to those that involved 'lascivious exhibition of the genitals.'" Gov't Mem. at 21. The Government then cites to Agent Bogdanski's affirmation, submitted in opposition to Mr. Groezinger's pretrial motions, which explains that the majority of the images that Agent Bogdanski reviewed "depicted sexual intercourse and masturbation." *Id.* at 21. The Government is correct that images falling within these categories of sexually explicit conduct do not generally "'call[] into play imprecise value judgments'" of the viewer, *id.* (citing *Jasorka*, 153 F.3d at 60), but this *post hoc* argument highlights the problems with the manner in which the Government has proceeded in this case. "Generally a

court that is assessing whether probable cause was shown must look only to the information that was before the magistrate," *United States v. Taborda*, 635 F.2d 131, 140 (2d Cir.1980); *see also Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 565 n. 8, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), and here the magistrate judge did not have any information describing, or noting which category of sexually explicit conduct, the photographs that Mr. Groezinger received from the CA Perpetrator depicted. Given that Agent Bogdanski had reviewed those photographs, he easily could have inserted into the warrant affidavit the additional information contained in the affirmation or "a reasonably specific" description of those photographs. *See New York v. P.J. Video*, 475 U.S. 868, 874 n. 5, 106 S.Ct. 1610, 89 L.Ed.2d 871 (1986).

153 F.3d at 60. The warrant affidavit states that Mr. Groezinger received "many" images containing "child pornography," Briccetti Affirm. Exh. B ¶ 10, but does not contain any description of these images. *Cf. Genin,* 594 F.Supp.2d at 416–17 (noting that the warrant affidavit contained some—albeit, insufficient—description of the allegedly pornographic videos). Similarly, the warrant affidavit notes that the CA Perpetrator was arrested on "charges of receipt and distribution of child pornography," Briccetti Affirm. Exh. B ¶ 8, but it does not state which category of sexually explicit conduct those materials fell into, or, more important, describe the images. The warrant affidavit simply rests on the agent's *ipse dixit.*

The only other indicia of probable cause contained in the warrant affidavit is Mr. Groezinger's statement to the CA Perpetrator on Google Hello that he had spotted the CA Perpetrator in "dirtyhello" and that he "liked 'anything young and cute no age prefs.'" Briccetti Affirm. Exh. B ¶ 10.a. These statements, however, are not inconsistent with someone seeking images depicting individuals who are over the age of eighteen. The Government argues that a fact may ultimately have an innocent explanation without necessarily negating probable cause. Mr. Groezinger's statements, according to the Government, "must be considered in the proper context, along with the other facts presented in the [w]arrant [a]ffidavit." Gov't Mem. at 24. These statements "were sent during a Google Hello chat in which images, alleged to contain child pornography, were exchanged with an individual already charged with distributing . . . child pornography via that same chat program." *Id.* at 24. This argument, though, brings one back to the initial defect in the warrant affidavit: its failure to state which category of sexually explicit conduct the images fell into or provide any description of those images so that a neutral and detached magistrate could determine whether the photographs depicted sexually explicit conduct.[7]

As in *Genin,* the warrant affidavit here did not provide sufficient information for the magistrate to make an *independent* determination that a search of Mr. Groezinger's residence stood a fair probability of uncovering contraband, and therefore the magistrate lacked a substantial basis for issuing the search warrant. *See Gates,* 462 U.S. at 236, 103 S.Ct. 2317.

The next issue that the Court shall consider is whether the good-faith exception to the exclusionary rule applies under these circumstances.

### 3. The Good–Faith Exception Applies

█ In *Genin,* this Court found that the warrant affidavit was not supported by probable cause but nonetheless determined that the good-faith exception to the exclusionary rule applied. *See generally Herring v. United States,* —— U.S. ——,

---

**7.** The Government also relies on *United States v. Martin,* 426 F.3d 68 (2d Cir.2005). In *Martin,* the Second Circuit found probative "the characteristics and proclivities of child pornography collectors" despite the fact that the only evidence regarding defendant's status as a collector was a subscription to a website whose "essential purpose was to trade child pornography" and despite the fact that there was no evidence that the defendant ever had downloaded child pornography from the site. *Id.* at 75–77. The Government contends that "[t]he inferential step required here—i.e., that someone who had solicited and received images containing child pornography had collected those or other images—is certainly no larger than the inferential step accepted in *Martin.*" Gov't Mem. at 25. This argument also ignores the warrant affidavit's failure to state which category of sexually explicit conduct the images fell into or provide any description of those images.

129 S.Ct. 695, 699–702, 172 L.Ed.2d 496 (2009); *United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). After setting forth the principles governing the good-faith exception, the Court explained that three reasons supported the exception's application. First, the "requirement that, in the lasciviousness context, law enforcement officials append to the warrant affidavit, or include therein a reasonably detailed description of, the allegedly proscribed material is relatively new and, at least within the Second Circuit, 'unclear.'" *Genin,* 594 F.Supp.2d at 426 (citing *Jasorka,* 153 F.3d at 61). Second, "the problem with the warrant affidavit in this case—the agent's bare conclusion that videos contained 'child pornography'—is novel in that it is one step removed from the problem described in cases outside of the district, in which the agents had concluded that the allegedly illegal materials were 'lascivious'—thus obscuring the import of those cases." *Id.* (citing *Brunette,* 256 F.3d at 15; *Jasorka,* 153 F.3d at 59). Finally, "although probable cause was lacking," this Court explained, it "believed that it was a close issue and 'certainly an issue upon which reasonable minds can differ.'" *Id.* (quoting *United States v. Falso,* 544 F.3d 110, 117 (2d Cir.2008)). The warrant affidavit at issue in this case was submitted on September 8, 2008, more than four months prior to *Genin,* and the Court finds that the same reasons articulated in *Genin* apply here.

Mr. Groezinger nevertheless makes several arguments for why the good-faith exception does not apply in this case. *First,* "the government," Mr. Groezinger argues, "cannot plausibly claim that Agent Bogdanski was not on notice of the *Jasorka* district court ruling, and more particularly the *Brunette* circuit court ruling." Def.'s Mem. at 20. This is so, according to Mr. Groezinger, because of Agent Bogdanski "swore under oath that he [was] personally familiar with numerous published opinions dealing with another aspect of the probable cause determination (staleness)" and because he "is a veteran agent with long experience investigating computer crimes in general and child pornography crimes in particular." *Id.* at 19–20. *Second,* Mr. Groezinger notes that there are several errors in the warrant affidavit and that, as a result of those errors, the magistrate judge was knowingly and recklessly misled. In particular, Mr. Groezinger focuses on the warrant affidavit's statements that, on January 19, 2008, picluverinusa had "sent" images containing child pornography, when, in fact, he had only received such images.

Mr. Groezinger's arguments are not persuasive. The errors contained in the warrant affidavit—which the Government has forthrightly acknowledged—were not material, and, moreover, there is no indication that they were anything but inadvertent. Even after the error is excised, *see Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the warrant affidavit nevertheless states that Mr. Groezinger had "received" in excess of 25 images many of which contained child pornography—which, of course, is a violation of federal law, *see* 18 U.S.C. § 2252A(a)(2)(B). More important, however, is the fact that Agent Bogdanski had personally reviewed the images received by Mr. Groezinger and that many of those images depicted minors engaged in sexual intercourse and masturbation, *see* Bogdanski Affirm. ¶ 3–4, categories of sexually explicit conduct that are "clearly defined and easily recognized." *Genin,* 594 F.Supp.2d at 420 (quoting *Jasorka,* 153 F.3d at 60). Although the information contained in Agent Bogdanski's affirmation "cannot support [the Government's] probable cause claim," it is strong evidence of

the agent's "good-faith reliance on the warrant," *see Falso*, 544 F.3d at 127 n. 22, given the lack of any requirement at the time in the Second Circuit or in this judicial district that a warrant affidavit contain a detailed description of images depicting sexually explicit conduct. Consequently, the Court finds that the Agent Bogdanski's reliance on the magistrate judge's probable cause determination was objectively reasonable.

Under the circumstances of this case—where the legal principles that resulted in the nullification of a probable cause determination were unclear at the time that the warrant was issued and where the law enforcement official relied in good-faith on the magistrate's probable cause determination—the Court finds that the "marginal or nonexistent benefits produced by suppressing [the] evidence ... cannot justify the substantial costs of exclusion." [8] *Leon*, 468 U.S. at 922, 104 S.Ct. 3405.

## B. Motion to Suppress Statements

Next, Mr. Groezinger seeks to suppress the statements that he gave while the agents were executing the search warrant on the ground that those statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ Statements stemming from the custodial interrogation of an individual are presumed involuntary, and therefore inadmissible, unless the authorities administer the now familiar warnings first set forth in *Miranda*. In this case, there is no dispute that Mr. Groezinger was interrogated and that no *Miranda* warnings were administered. Accordingly, whether Mr. Groez-

inger's statements must be suppressed will depend on whether he was in custody.

■ Whether a person is in custody for purposes of *Miranda* "depends on the objective circumstances of the interrogation," the Supreme Court has explained, "not the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 6.6(c) (4th ed. 2002) ("This objective approach will often require a careful examination of all the circumstances of the particular case."). The inquiry asks whether there has been a " 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (*per curiam*)); *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir.1992). The Second Circuit has instructed district courts "to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir.2004). If the answer to that question is yes, then no *Miranda* warnings were necessary. If the answer is no, then "a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* "Only if the answer to this second question is yes," the Second Circuit noted, "was the person 'in custody' for practical purposes,' and entitled to the full panoply of protections prescribed by *Miranda*." *Id.* (quoting *Berkemer v.*

8. As such, the Court also denies Mr. Groezinger's motion to suppress as a fruit of the poisonous tree his statements to the authorities and the Maxtor hard drive that Mr. Groezinger had given to his tenant.

*McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

▮▮▮ In this case, Agent Bogdanski and other law enforcement agents arrived at Mr. Groezinger's residence at approximately 6:00 a.m. The agents, who were armed but did not brandish their weapons, notified him that they had a warrant to search his residence, and Mr. Groezinger opened the door and allowed the agents to enter. As the agents conducted a protective sweep of the residence, they asked Mr. Groezinger to remain in the living room and told him *explicitly* that he was not under arrest. Thereafter, two agents remained with Mr. Groezinger at the kitchen table while the other agents executed the search. The agents were positioned so as to block Mr. Groezinger's access to the kitchen exit. While sitting at the kitchen table, Mr. Groezinger claims that he "got up once or twice and was told to sit down." Groezinger Aff. ¶ 3.[9] Mr. Groezinger also had to ask the agents' permission to brew coffee, which they granted. In response to the agents' questions, Mr. Groezinger explained that he had gotten rid of his old computer because "the motherboard fried." Gov't Mem. at 10. Mr. Groezinger also informed the agents that he was an attorney and that he had to catch the 7:00 a.m. train to make a morning court appearance in the Southern District of New York. The agents told Mr. Groezinger that he was going to be late. The search of Mr. Groezinger's residence took approximately an hour and a half.

It is clear from this recitation of the facts, which are not disputed by the parties, that a reasonable person in Mr. Groezinger's shoes would not have believed that he was "free to leave the police

encounter at issue." *Newton,* 369 F.3d at 672. Law enforcement officials were searching his house, agents remained with him in the kitchen, and they limited his freedom to move about his home. The issue therefore is whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* The Court believes not. When Mr. Groezinger's allowed the agents to enter his home, they stated that they were there to execute a search warrant, and, notably, they explicitly told him that he was *not* under arrest. After Mr. Groezinger informed the agents that he was an attorney and that he had a morning court appearance in Manhattan, the agents told him that he was going to *late,* thus indicating that he would be free to leave once the search was completed. Although two agents controlled Mr. Groezinger's movements while other agents executed the search, the authorities did not act in a manner that would have led a reasonable person to understand his freedom of action "curtailed to a degree associated with a formal arrest." *Id.* The search took about an hour and a half, but Mr. Groezinger was questioned in his own home, *see Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), was not handcuffed or otherwise physically restrained, *cf. Newton,* 369 F.3d at 675, was not removed from his residence, was permitted to brew coffee—a privilege not usually bestowed upon a person under arrest—and, at the very beginning of the encounter, was explicitly told that he was not under arrest. Under these circumstances, the Court finds that a reasonable person in Mr. Groezinger's shoes would not "have

---

9. In his affidavit, Mr. Groezinger also claims that he "expected to be formally arrested." Groezinger Aff. ¶ 7. Because the determination whether an individual was in custody for

purposes of *Miranda* is an objective inquiry, Mr. Groezinger's "subjective understanding is ... irrelevant." *United States v. Kirsteins,* 906 F.2d 919, 923 (2d Cir.1990).

understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* at 672. Consequently, the authorities were not required to advise Mr. Groezinger of his *Miranda* rights.

Mr. Groezinger's motion to suppress his statements is therefore denied.

## C. Discovery Requests

██ Mr. Groezinger's motion for early disclosure of materials under *Giglio*,[10] the Jencks Act, 18 U.S.C. § 3500, and Rule 404(b) is denied. The Government has represented to the Court that it has complied, and will continue to comply, with its *Brady* obligations and that it will turn over *Giglio* and Jencks Act, 18 U.S.C. § 3500, materials in time for effective use. *See In re United States v. Coppa*, 267 F.3d 132, 147 (2d Cir.2001) ("We reiterate the long-standing constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner."); *United States v. Trippe*, 171 F.Supp.2d 230, 237–38 (S.D.N.Y.2001) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act Material, that is, at least one day before the Government witness is called to testify."). The Government has indicated that it will make the required disclosure two weeks prior to trial, a practice that typically comports with Rule 404(b). *See United States v. Fennell*, 496 F.Supp.2d 279, 284 (S.D.N.Y.2007).

Mr. Groezinger's request for disclosure of the Government's witness and exhibit lists also is denied. *See United States v. Cannone*, 528 F.2d 296, 301 (2d Cir.1975) (holding that, absent a specific showing of reasonableness and materiality to the

preparation of a defense, the defendant is not entitled to disclosure of the Government's witnesses); *United States v. Falkowitz*, 214 F.Supp.2d 365, 392 (S.D.N.Y. 2002) (disclosure of exhibit list is within the sound discretion of the district court and is typically ordered if there are voluminous documents).

## Conclusion

The magistrate did not have a substantial basis for finding probable cause to issue a search warrant. The warrant affidavit neither appended nor described in reasonably specific detail the allegedly proscribed images, and thus it did not allow the magistrate independently to evaluate the allegedly proscribed materials, as required by the Fourth Amendment. *United States v. Genin*, 594 F.Supp.2d 412, 418–426 (S.D.N.Y.2009); *see also Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The warrant affidavit, however, was not so lacking in indicia of probable cause that a reasonably well trained agent would have known that the search was illegal despite the magistrate's authorization. The Court therefore holds that the good-faith exception applies, and the evidence shall not be excluded.

Although the authorities interrogated Mr. Groezinger without advising him of his *Miranda* rights, a reasonable person in his shoes would not have "understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Newton*, 369 F.3d at 672. As a result, agents were not required to advise Mr. Groezinger of his *Miranda* rights.

The Clerk of the Court is directed to close docket entry number 12.

*It is so ordered.*

**10.** *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).