2021 IL App (1st) 192295-U

No. 1-19-2295

Order filed December 16, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 4554 |
| | ) | |
| CALVIN WILSON, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lampkin and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction for armed habitual criminal over his contentions that the trial court erred by denying his motion to suppress statements and that he was denied effective assistance of counsel.

¶ 2    Following a jury trial, defendant Calvin Wilson was found guilty of armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2018)) and sentenced to six years in prison. On appeal, defendant contends that the trial court erred by denying his motion to suppress his statements to

officers who used an unconstitutional "question first, warn later" interrogation strategy. He further argues he was denied effective assistance when trial counsel conceded his guilt. We affirm.

¶ 3    Defendant was charged by indictment with armed habitual criminal and five counts of unlawful possession of a weapon by a felon following his February 22, 2019 arrest.

¶ 4    Prior to trial, defendant filed a motion to suppress statements alleging that officers used a "question first, warn later" interrogation strategy in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004), and failed to take "curative measures" after administering the warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 5    At the hearing on the motion, Chicago police officer David Jeffrey testified that on the morning of February 22, 2019, he and his partner Officer Juan Tapia helped execute a search warrant in the 1600 block of South Sawyer Avenue. Prior to arriving, Jeffrey learned the target's name and viewed his photograph. He identified defendant in court as that person.

¶ 6    At the address, officers removed defendant from a vehicle. Jeffrey escorted defendant to the front of a patrol car, but did not remember sitting him on its hood or whether defendant was handcuffed. Jeffrey asked "general questions," but did not provide *Miranda* warnings. After defendant stated that he found a pistol, Jeffrey told him to stop talking and Mirandized him. Jeffrey then further questioned defendant, who related that he found a pistol and gave its location in the house.

¶ 7    The defense published Jeffrey's body camera footage. Jeffrey narrated the video, which is included in the record on appeal and depicts him speaking to defendant while other officers appear at the left and center of the frame and oftentimes speak at the same time as defendant and Jeffrey.

The video lasts approximately six minutes. The audio quality is poor and cuts out at several points, and a transcript contained in the record notes that multiple statements are inaudible.

¶ 8    In the video, defendant sits in a vehicle and Jeffrey asks his name, where he lives, and which floor. Defendant replies, and Jeffrey tells defendant that he is being recorded and asks whether defendant has anything on him. Defendant answers no as Tapia cuffs him and he is allowed to sit on the hood of the police vehicle.

¶ 9    As Jeffrey says that he wants to explain something, defendant offers his keys so that the front door is not broken. Jeffrey asks if defendant understands what is happening. Defendant answers yes, and Jeffrey states that officers have a search warrant. Defendant then says he knows all about that "bull s***" and "[a]in't nothing in there." Another officer enters the frame, and a voice asks if anyone is inside and defendant answers no. Jeffrey asks whether there is "anything in there" and tells defendant to be honest before officers "start tearing up the house." A voice off camera asks whether anyone is inside. According to the transcript, an officer asks if there is a dog in the house. At this point, there are three other officers in the frame. Defendant answers that he will tell the truth and that he found an "old raggedy pistol." As another officer says "Okay," defendant mutters something inaudible, and Jeffrey tells defendant to stop talking.

¶ 10    As defendant continues to speak, Jeffrey asks another officer for an "FOP" book (containing the *Miranda* warnings), again tells defendant to stop talking, and says he will "Mirandize" defendant. While Jeffrey recites the *Miranda* warnings, other officers ask about the firearm and defendant talks about his keys and says other inaudible things. Jeffrey tells defendant to "hold on" several times, finishes the *Miranda* warnings, and asks whether defendant wishes to speak to officers. Defendant agrees to answer questions. Jeffrey asks what is inside the house that

officers need to know about, and defendant says he found an old pistol and gives its location within the house.

¶ 11    During cross-examination, Jeffrey testified that the search warrant described narcotics rather than a firearm. When executing a search warrant, police secure the area to protect officer and citizen safety. Defendant was outside, but Jeffrey did not know who or what was in the building. Although the video depicted another officer asking defendant if anyone else was inside, Jeffrey denied personally asking defendant "those types of questions." When defendant responded to the other officer's question and stated that he found a pistol, Jeffrey told defendant to stop talking and recited the *Miranda* warnings but defendant continued to speak.

¶ 12    After completing the *Miranda* warnings, Jeffrey asked defendant if he wanted to talk and defendant agreed. Jeffrey asked defendant what officers needed to know was in the house, and defendant mentioned the pistol and its location. Prior to defendant's statement, Jeffrey had no reason to believe a pistol was in the house. During redirect, Jeffrey testified that he did not believe he had radio contact with other officers while speaking with defendant, and did not relay the information he received to other officers.

¶ 13    In denying the motion, the trial court noted that defendant interjected "thoughts and comments" while officers questioned him, and the video showed a "tremendous amount of disorganization." Jeffrey and other officers were not communicating with the team entering the residence, officers on the video interrupted each other, and the court found no strategy in "three people interrogating someone on the street" while *Miranda* warnings were read. Jeffrey issued the warnings immediately after hearing about the pistol, and then asked if defendant wished to speak

to the police. The court noted that defendant interrupted questions "before they were completely made" and concluded that the statements were voluntary.

¶ 14    The State proceeded on the charge of armed habitual criminal at trial. During opening statements, defense counsel submitted that defendant found a firearm outside his house, placed it in a storage room to keep it from his children and grandchildren, and "did what he thought was best." Thus, according to counsel, the State could not prove that defendant's "intent was to possess that firearm."

¶ 15    The State called Jeffrey, whose testimony largely comported with his testimony at the suppression hearing. On February 22, 2019, Jeffrey and Tapia wore body cameras. After Mirandizing defendant, Jeffrey asked about the firearm and defendant stated he found an "old, raggedy" pistol and gave its exact location in "the first room on the left." Jeffrey also asked defendant whether he was a convicted felon and defendant answered yes. Jeffrey then entered the residence and retrieved the loaded pistol. Jeffrey's body camera video was published.

¶ 16    During cross-examination, Jeffrey testified that defendant truthfully answered general questions about his name and address, complied with the request to exit the vehicle, and did not resist handcuffing. Jeffrey did not advise defendant of the *Miranda* warnings prior to asking whether "anything" was in the house, and asked defendant to be honest. At that point, defendant stated he found a pistol. Jeffrey then read the *Miranda* warnings and asked whether officers needed to know about anything inside the house. Defendant repeated that he found an old raggedy pistol and related its exact location. When Jeffrey recovered the pistol, it lacked the cylinder release.

¶ 17    Tapia testified that he detained defendant, and removed the keys from the vehicle's ignition. He then asked defendant which keys operated particular locks at the residence, and used

them to enter the basement apartment. The footage from Tapia's body camera, which was published and is included in the record on appeal, shows Tapia cuffing defendant, removing the keys from the vehicle, and unlocking the doors and gates to a basement apartment.

¶ 18     The State entered a stipulation that defendant was previously convicted of the qualifying felony offenses of possession of a controlled substance with intent to deliver in case number 07 CR 06747-01, and burglary in case number 03 CR 10845-02.

¶ 19     Defendant testified that he had a 2014 conviction for possession of a controlled substance. One day in late January 2019, his wife observed a pistol beside the house. Since the pistol was "not safe" outside, defendant put the pistol in a storage room where his children and grandchildren did not go. Defendant did not call the police because he had not had "good encounters" with them and "figure[d]" they would take him "straight back to prison." He also feared being arrested if he took the pistol to a "buyback" program. Defendant did not intend to possess the pistol and never removed it from the storage room.

¶ 20     During cross-examination, defendant testified that the storage room was always locked and that he believed it was locked on February 22, 2019. He gave the officers his keys so that they would not "tear the house up."

¶ 21     In rebuttal, Tapia testified that he and another officer entered and "clear[ed]" the residence, including a room to the left that had an open door without locks. Additional footage from Tapia's body camera was then published. This footage is included in the record on appeal and depicts officers entering the basement apartment. The first door on the right is closed with items piled in front, there are two additional open doors on the right, and one open door to the left, as well as a doorway at the end of the hall.

¶ 22    In closing argument, the State asserted that defendant testified regarding his uncorroborated thoughts and feelings, but the video showed that the storage room was not locked. In response, trial counsel argued that defendant acted conscientiously when he took a firearm off the street and "buried" it in a box in a storage room. According to counsel, defendant was truthful with officers and never intended to possess the pistol. In rebuttal, the State argued that defendant constructively possessed the firearm when he put it in a storage bin in his home and that his intentions did not matter.

¶ 23    The jury found defendant guilty of armed habitual criminal. Defendant filed a motion for a new trial alleging, relevant here, that the trial court erred when it denied his motion to suppress statements and that he was not proven guilty beyond a reasonable doubt. At a hearing on the motion, trial counsel argued that the State failed to establish that defendant intended to possess the firearm. The trial court denied the motion, and following a hearing, sentenced defendant to six years in prison. Defendant filed a motion to reconsider sentence, which the trial court denied.

¶ 24    On appeal, defendant first contends that the trial court erred in denying his motion to suppress his statements preceding the *Miranda* warnings where he was subjected to custodial interrogation without first being advised of his rights. Additionally, he posits that any statements made after being advised of his rights should be suppressed because Jeffrey used a "question first, warn later" interrogation tactic without curative measures.

¶ 25    We review the trial court's ruling on a motion to suppress under a two-part standard. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Under this standard, we give deference to the court's findings of fact, reversing them only where they are contrary to the manifest weight of the evidence. *People v. Cosby*, 231 Ill. 2d 262, 271 (2008). However, we review *de novo* the court's

ultimate legal ruling as to whether suppression was warranted. *Id.* We may consider the trial testimony and testimony from the suppression hearing. *People v. Slater*, 228 Ill. 2d 137, 149 (2008). "Where a defendant challenges the admissibility of a confession through a motion to suppress, the State bears the burden of proving the confession was voluntary by a preponderance of evidence." *Id.*

¶ 26 In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court held that a person questioned by police must first "be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," as long as that person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. "The finding of custody is essential, as the preinterrogation warnings required by *Miranda* are intended to assure that any inculpatory statement made by a defendant is not simply the product of the compulsion inherent in custodial surroundings." (Internal quotation marks omitted.) *Slater*, 228 Ill. 2d at 149-50. Accordingly, *Miranda* is not triggered when officers conduct "general investigatory on-the-scene questioning as to the facts surrounding a crime." *People v. Hannah*, 2013 IL App (1st) 111660, ¶ 42; see also *Miranda*, 384 U.S. at 477-78 (differentiating between general questioning and the "compelling atmosphere inherent in the process of in-custody interrogation").

¶ 27 Here, even assuming that defendant was in custody when he made his initial statement to Jeffrey, the questioning falls under the public safety exception to *Miranda* established in *New York v. Quarles*, 467 U.S. 649 (1984).

¶ 28 In that case, two police officers were approached by a woman who stated that she had just been raped, described the offender, and said he was armed. After entering a store, one officer saw

the defendant, who matched the description, and eventually detained him. After a search revealed the defendant was wearing an empty shoulder holster, an officer asked the location of the firearm. The defendant stated that " 'the gun is over there,' " nodding at an empty carton nearby. *Id.* at 652. The officer retrieved a loaded firearm from the carton, arrested the defendant, and read him the *Miranda* warnings. *Id*. The trial court suppressed the statement and the firearm because the officer did not Mirandize the defendant prior to questioning.

¶ 29    The Supreme Court found a public safety exception to *Miranda* and held that a police officer may ask limited questions to a suspect without first giving him *Miranda* warnings if reasonably necessary "to secure" the safety of the officer or the public. *Id.* at 658-59. The Court noted that the firearm posed a danger to public safety because an accomplice might use it or a customer or an employee may have come upon it in the busy store. *Id.* at 657. The police officer asked about the firearm immediately after apprehending the defendant and was concerned about the whereabouts of a weapon that he believed the defendant had discarded in the store. *Id.*

¶ 30    The Court described the exigent circumstances under which the public safety exception would apply as those where the police must decide "in a matter of seconds," "in a kaleidoscopic situation" where "spontaneity rather than adherence to a police manual is necessarily the order of the day." *Id.* at 655-57. Requiring *Miranda* warnings under such circumstances would oblige officers to decide whether to ask the question without the warnings and render the evidence inadmissible, or give the warnings and possibly prevent the defendant from giving the information needed to neutralize a volatile situation. *Id.* at 657-58. Accordingly, the exception is narrow and based upon the exigencies of the circumstances facing the officers during the inquiry. *Id.* at 658-59. The Court therefore found, based on this public safety exception, that the defendant's statement

and the firearm were admissible. *Id.* at 659-60. See also *United States v. Newton*, 369 F.3d 659, 677-78 (2d Cir. 2004) (quoting *Quarles*, 467 U.S. at 659 n.8) (rather than focusing on the officers' subjective motivation, the exception applies as long as the questioning " 'relate[s] to an objectively reasonable need to protect the police or the public from any immediate danger' ").

¶ 31    In *People v. Williams*, 173 Ill. 2d 48 (1996), our supreme court similarly recognized the public safety exception. In that case, a suspect was handcuffed and subjected to a pat-down pursuant to an arrest for a recent shooting. When officers asked whether the defendant had any weapons or needles "on him," the defendant responded he had a firearm in the attic. *Id.* at 56.

¶ 32    In affirming the denial of his motion to suppress, our supreme court relied on the observation in *Quarles* that " 'the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination.' " *Williams*, 173 Ill. 2d at 77 (quoting *Quarles*, 467 U.S. at 657); *cf. Hannah*, 2013 IL App (1st) 111660, ¶ 47 (finding that the public safety exception did not apply when an officer had already recovered the weapon and then asked a handcuffed suspect " 'whose gun is this?' ").

¶ 33    In the present case, officers were about to enter defendant's home, a two story building, pursuant to a search warrant. The building and its occupants and layout were unknown to the officers. Jeffrey asked about anything the officers needed to know before entering the building. Jeffrey testified that he had no reason to believe a firearm was inside, but considering the building was locked, he could reasonably have believed that other individuals, hidden weapons, unknown conditions, or objects inside could endanger the officers. As such, we find that Jeffrey's inquiry was justified for ensuring officer safety, and did not constitute illicit interrogation in violation of

*Miranda*. See *United States v. Are*, 590 F.3d 499, 505-07 (7th Cir. 2009) (applying the public safety exception when a defendant was handcuffed in his home pursuant to search warrant, was asked whether weapons were in the house, and stated an automatic weapon was under a dresser); *Newton*, 369 F.3d at 678-79 (applying the public safety exception when the defendant was handcuffed in apartment and asked whether he had " 'contraband,' " where officers knew a firearm was present and the family was involved in a domestic dispute); *United States v. Williams*, 181 F.3d 945, 953-54 (8th Cir. 1999) (applying the public safety exception when an officer asked, " 'is there anything we need to be aware of?' " because officers were unaware whether armed individuals or other "hazardous weapons" were inside the apartment).

¶ 34     We are unpersuaded by defendant's reliance on *People v. Fort*, 2014 IL App (1st) 120037. In that case, police officers "forcibly" entered the defendant's home with drawn firearms. *Id.* ¶ 3. After the defendant and others were found inside, the defendant was escorted to another floor, where an officer asked a question that she answered. *Id.* The defendant moved to suppress her statements, as the officer did not give the *Miranda* warnings.

¶ 35     At the hearing on the motion, the officer testified that after the residents were gathered in one room, the defendant asked if she could retrieve her baby from her bedroom. *Id.* ¶ 4. The officer asked for a supervisor's permission, escorted the defendant to the bedroom, and then asked " 'if there [was] anything in the room [police] should know about.' " *Id.* The defendant then stated that she had cocaine in her bedding. *Id.* The officer observed that the defendant wanted to enter a " 'room that [was not] cleared of any weapons or type of instruments that could harm police officers,' " and that he asked " 'if there was anything in the room for my safety and the safety of the other officers.' " *Id.* ¶ 35. The defendant denied the interaction and the statement. *Id.* The trial

court denied the motion to suppress statements, and following a bench trial, found the defendant guilty of possession of a controlled substance. *Id.* ¶¶ 5-7. The defendant appealed, contending that the trial court erred in denying her motion to suppress statements.

¶ 36    On appeal, this court noted that the defendant was questioned in her home after officers made "a considerable show of force" by entering with drawn firearms and "round[ing] up" most of the inhabitants. *Id.* ¶ 14. Moreover, the defendant was separated from her infant, requested permission to retrieve the infant, and was then accompanied by an officer. *Id.* ¶ 15. Considering these circumstances, this court determined that the defendant was in custody during questioning, and therefore, reversed the denial of the motion to suppress statements. *Id.* ¶¶ 15-16, 18.

¶ 37    Initially, we note that the Fort majority did not discuss the application of the public safety exception. Moreover, the questioning in that case occurred after officers entered the home with drawn weapons and secured the residence and its occupants. In the case at bar, police officers encountered defendant outside the premises to be searched and were unaware of possible threats inside the locked building. Considering that the building could have contained people, dangerous conditions or circumstances which could threaten officer safety, Jeffrey's inquiry was motived by concern for officer safety rather than a desire to induce defendant to incriminate himself, and therefore, fall under the public safety exception to *Miranda*. Accordingly, the trial court properly denied the motion to suppress defendant's statement preceding the *Miranda* warnings.

¶ 38    Defendant next contends that his post-*Miranda* statement should have been suppressed because Jeffrey used an unconstitutional "question first, warn later" interrogation technique.

¶ 39    "A confession is voluntary if it is the product of free will, rather than the product of the inherently coercive atmosphere of the police station." *People v. Nicholas*, 218 Ill. 2d 104, 118

(2005). As a guard against self-incrimination, statements made in response to custodial interrogation must be suppressed unless they are preceded by *Miranda* warnings. *Miranda*, 384 U.S. at 478-79. However, the failure to Mirandize a defendant before his initial inculpatory statement does not necessarily require the suppression of statements made after the defendant was so warned. *Oregon v. Elstad*, 470 U.S. 298, 314 (1985).

¶ 40    Although "*Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Elstad*, 470 U.S. at 309.  The Court explained that:

> "absent deliberatively coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." *Id.* at 314.

¶ 41    In *Missouri v. Seibert*, 542 U.S. 600 (2004), the United States Supreme Court condemned the "question first, warn later" interrogation technique and mandated the suppression of statements that resulted from use of that tactic. Pursuant to this technique, an officer interrogates a suspect and obtains an incriminating statement, then provides the *Miranda* warnings, and repeats the question until the accused repeats the original answer. *Id.* at 611-12. The Court reasoned that *Miranda* warnings given after eliciting a confession would be ineffective in conveying to a defendant the nature of his rights, including the right to remain silent, and the consequences of

abandoning those rights. *Id*. at 613-14. In his concurrence, Justice Kennedy advocated a narrower test, finding the plurality's test was too broad because it applied to both intentional and unintentional two-step interrogations. *Id*. at 621-22 (Kennedy, J., concurring). In contrast, Justice Kennedy's test would apply only where police deliberately employed a two-step interrogation in a calculated effort to undermine *Miranda* warnings. *Id*. at 622 (Kennedy, J., concurring).

¶ 42     Justice Kennedy recognized situations where officers do not deliberately withhold *Miranda* warnings, and that "[a]n officer may not realize that a suspect is in custody and warnings are required," or "may not plan to question the suspect or may be waiting for a more appropriate time." *Id*. at 620 (Kennedy, J., concurring). Since *Elstad* and *Seibert* were decided, the *Elstad* standard has been applied, except where police deliberately attempted to evade *Miranda* by not offering the warnings until after a defendant has confessed. See *People v. Lopez*, 229 Ill. 2d 322, 360-61 (2008).

¶ 43     In *Lopez*, our supreme court adopted Justice Kennedy's concurrence in *Seibert*, and reiterated that the relevant framework is to first determine if the police deliberately engaged in a "question first, warn later" technique while interrogating a defendant. *Id*. at 360. Absent evidence of deliberate conduct, the *Seibert* analysis ends. *Id*. " '[I]n determining whether the interrogator deliberately withheld the *Miranda* warning, courts should consider whether objective evidence and any available subjective evidence such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning.' " *Id*. at 361 (quoting *United States v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006)). Relevant evidence includes the timing, setting, and completeness of the prewarning interrogation; the continuity of police personnel; and the overlapping content of the unwarned and warned statements. *Id*. at 361-62.

¶ 44     In *Lopez*, our supreme court noted that the detective involved denied using the question first, warn later technique. *Id*. at 362. Regarding the objective evidence of the technique, the court noted that the police brought the 15-year-old defendant into an interrogation room at a police station at approximately 1 p.m., and stated that another person implicated him in a murder. *Id*. The defendant provided some information and was then left alone in the room for four or five hours with the door closed while the detectives continued to investigate. *Id.* The same detectives spoke with the defendant at 6 p.m., again stated he was implicated in the murder, and revealed that the other person had confessed. *Id*. Without providing *Miranda* warnings, the detectives asked the defendant whether he was involved, and the defendant made an oral inculpatory statement. *Id*. After the confession, detectives gave the defendant the *Miranda* warnings, and he thereafter gave a handwritten statement. *Id*. at 362, 365.

¶ 45     Our supreme court found that the detectives used a "question first, warn later" interrogation strategy by confronting the defendant with a statement implicating him, and after about five hours again confronting him with the same statement resulting in an oral confession, all without providing the *Miranda* warnings. *Id*. at 362-63. The court could "think of no legitimate reason why the detectives failed to give defendant his *Miranda* warnings prior to the 6 p.m. confrontation, other than a deliberate decision to circumvent *Miranda* in hopes of obtaining a confession, which would ultimately lead to a handwritten statement." *Id*. at 363-64.

¶ 46     Applying *Lopez* to the case at bar, no evidence, subjective or objective, indicates that the officers intentionally prevented defendant from asserting his *Miranda* rights, or that Jeffrey deliberately delayed the *Miranda* warnings. According to Jeffrey, he only asked general questions as to defendant's identity and address, and whether officers needed to know anything before

entering the house. Detaining defendant was not a coercive measure intended to induce an admission, but had a legitimate reason—the officers' safety when executing the search warrant. Once defendant made the initial statement about the firearm, Jeffrey immediately told him to stop talking, and related the *Miranda* warnings. The video shows that Jeffrey, defendant, and other officers were all speaking at the same time, and defendant ignored Jeffrey's repeated attempts to have defendant stop speaking during the *Miranda* warnings.

¶ 47    Unlike *Lopez*, where the interrogation occurred at the police station sometime after the offense being investigated, here, the questioning took place outside the home subject to the search warrant. As the trial court noted, the setting and chaotic nature of the interaction indicates that Jeffrey lacked the time or opportunity to create a strategy to circumvent *Miranda*. Moreover, Jeffrey sought identification and safety information, and the questions posed by other officers involved whether the house contained anything that should concern them. This was not "systematic, exhaustive [questioning] managed with psychological skill." See *Seibert*, 542 U.S. at 616.

¶ 48    Additionally, as soon as defendant mentioned the pistol, Jeffrey told him to stop talking and attempted to relate the *Miranda* warnings. The immediacy of the *Miranda* warnings following defendant's statement is another objective factor showing that Jeffrey did not deliberately attempt to engage in the question first, warn later interrogation technique. Although Jeffrey and defendant did not relocate after Jeffrey advised him of the *Miranda* warnings and asked whether he wished to speak with officers, nothing indicates that Jeffrey intended to induce an inculpatory statement. Rather, this was part of the execution of the search warrant. Therefore, viewing all the objective evidence in its totality, we conclude that Jeffrey did not deliberately attempt to engage in the

question first, warn later technique to circumvent the *Miranda* requirements, and defendant's argument fails.

¶ 49    Defendant next contends that he was denied effective assistance when trial counsel conceded his guilt at trial. He posits that although counsel argued that defendant acted with "good intentions," that was not a valid defense and counsel's admission that defendant put the pistol in the storage room "legally amounted" to knowing possession of a firearm. The State responds that defendant received effective assistance when trial counsel worked "creatively" with the evidence, which included a video showing that defendant admitted to having a firearm in the house.

¶ 50    Claims of ineffective assistance are evaluated under *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11. To succeed, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and a reasonable probability that the outcome of the proceeding would have been different but for counsel's errors. *Id*. A defendant must establish both prongs in order to prevail on a claim of ineffective assistance. *People v. Cherry*, 2016 IL 118728, ¶ 24. "We review a defendant's claim of ineffective assistance of counsel in a bifurcated fashion, deferring to the trial court's findings of fact unless they are contrary to the manifest weight of the evidence, but assessing *de novo* the ultimate legal question of whether counsel was ineffective." *People v. Manoharan*, 394 Ill. App. 3d 762, 769 (2009).

¶ 51    Prejudice may be presumed when a defendant " 'is denied counsel at a critical stage,' " counsel " 'entirely fails to subject the prosecution's case to meaningful adversarial testing,' " or when counsel represents a client in circumstances under which no lawyer could provide effective assistance. *Cherry*, 2016 IL 118728, ¶ 25 (quoting *United States v. Cronic*, 466 U.S. 648, 659-61 (1984)). The United States Supreme Court later clarified that where "the possibility of presuming

prejudice [is] based on an attorney's failure to test the prosecutor's case, *** the attorney's failure must be complete." *Bell v. Cone*, 535 U.S. 685, 696-97 (2002).

¶ 52    Here, defendant argues that prejudice must be presumed when trial counsel failed to subject the State's case to meaningful adversarial testing. Defendant argues that counsel conceded his guilt by acknowledging that he put the pistol in the storage room, but never intended to possess it. Our supreme court has stated that this second "*Cronic* exception" is narrow and infrequently applies, and that the presumption of prejudice is triggered only where trial counsel's performance amounts to no representation at all. *Cherry*, 2016 IL 118728, ¶ 26.

¶ 53    The State charged defendant with being an armed habitual criminal, which requires proof that the defendant possessed a firearm after having been convicted of two offenses enumerated in the statute. 720 ILCS 5/24-1.7(a) (West 2018). The parties stipulated to defendant's two prior qualifying convictions, and thus the State only needed to prove defendant's possession of a firearm. At trial, the State introduced body camera footage in which defendant stated that he found a "old raggedy pistol" and put it in a storage room in his house.

¶ 54    A review of the record reveals that trial counsel subjected the State's case to meaningful adversarial testing while never conceding that defendant intended to possess the pistol. Prior to trial, counsel filed a motion to suppress defendant's statements regarding the pistol. At trial, counsel presented a theory that defendant was too afraid of the police to contact them regarding the pistol, so he hid it to protect his children and grandchildren. Counsel also cross-examined Jeffrey regarding his questioning of defendant and when the *Miranda* warnings were given, and presented defendant, who explained that he acted to protect his family, feared the police, and did not intend to possess the pistol. In opening statement and closing arguments, trial counsel argued

that defendant acted with good intentions and never intended to possess the pistol. Counsel thereafter filed a motion for a new trial alleging that the court erred when it denied the motion to suppress statements, and at the hearing thereon, argued that the State failed to establish that defendant intended to possess the pistol.

¶ 55 This record establishes that trial counsel did not concede defendant's guilt. Rather, counsel challenged the State's evidence, argued that defendant acted to protect his family, and explained why he was reluctant to contact the police. Considering that the State presented an officer and a video wherein defendant admitted he found a pistol and placed it in his home, counsel's trial strategy of justifying defendant's actions cannot render his performance ineffective.

¶ 56 *People v. Bloomingburg*, 346 Ill. App. 3d 308 (2004), is instructive. In that case, the defendant relied on *Cronic* to argue that he was denied effective assistance when trial counsel conceded his guilt during opening statements and then presented a self-defense theory that was inapplicable because he was the aggressor and not in imminent danger of great bodily harm. *Id.* at 316-17. On appeal, this court concluded that the presumption of prejudice did not apply when trial counsel (1) made pretrial motions to suppress evidence, (2) advanced a defense theory, (3) cross-examined most of the State's witnesses, (4) objected to adverse evidence, and (5) made a closing argument that defendant should not be convicted of first degree murder. *Id.* at 318. We determined that trial counsel had not entirely failed to subject the State's case to meaningful adversarial testing when counsel did not concede every significant aspect of the defendant's guilt and held the State to its burden of proof. *Id.*

¶ 57 Similarly, in the case at bar, we decline to presume prejudice. That said, as discussed, to succeed on an ineffective assistance claim, a defendant must demonstrate both that counsel's

performance fell below an objective standard of reasonableness and a reasonable probability that the outcome of the proceeding would have been different but for counsel's errors. *Henderson*, 2013 IL 114040, ¶ 11. To establish that counsel's performance was deficient, a defendant must overcome a strong presumption that the challenged action reflected sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). It is insufficient that counsel's strategy proved unsuccessful with the benefit of hindsight. *People v. Massey*, 2019 IL App (1st) 162407, ¶ 31. Rather, a trial strategy is unsound only where no reasonable defense attorney would pursue it under similar circumstances. *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (1997). Accordingly, our supreme court has found that decisions regarding trial strategy are generally immune from ineffective assistance claims. *Manning*, 241 Ill. 2d at 327.

¶ 58    Faced with video evidence of defendant admitting that he found a pistol and put it in his home and stating where it was located in his home and police recovering the pistol from that location, trial counsel first attempted to suppress defendant's statements. When that was unsuccessful, counsel presented a trial strategy to justify defendant's decision to hide the pistol rather than contact the police, and focused on his intent not to possess it. *Manning*, 241 Ill. 2d at 327. The mere fact that this strategy failed does not render counsel's performance deficient.

¶ 59    Based on the record before this court, defendant cannot show a reasonable probability that the outcome of his trial would have been different had counsel not acknowledged his admission that he found the pistol and placed it in his home or presented defendant's testimony to explain his actions. See *People v. Bew*, 228 Ill. 2d 122, 135 (2008) ("*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice"). Considering that the evidence at trial included defendant's statement on video that he found the pistol and placed it in his home, defendant cannot

establish prejudice from counsel's complained-of actions, and his ineffective assistance claim fails. *Cherry*, 2016 IL 118728, ¶ 24.

¶ 60    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 61    Affirmed.